JOHN A. DANIELLY *et al.*, plaintiffs in error, *vs.* THOMAS B. CABANISS *et al.*, defendants in error.

(TRIPPE, Judge, having been of counsel, did not preside in this case.)

1. It is within the purposes and scope of a municipal corporation to apply the corporate funds, or to create a corporate debt, for the purchase of an interest in a building to be used as a public school or college, for the accommodation of the people of the town; nor does the fact that superintendence of the school is left in the hands of trustees not elected by the corporation, render the appropriation of the corporate funds illegal, it appearing that the enterprise is not for any private gain, and it appearing that the trustees contract to keep up, in the building, a public school.

2. The election in a corporate town, expressing the assent of the people to a subscription by the authorities to a public enterprise, may take place before as well as after the legislative act authorizing the subscription.

3. Where an act was passed by both branches of the legislature, and was in fact transmitted to the governor more than five days before the adjournment, and the governor failed either to approve or to veto it, or even to enter upon it the day of its receipt by him, or to transmit it to the office of the secretary of state, and the same legislature, at a subsequent session, after investigation of the facts by a committee, declared the act to have been duly presented and to have become a law, and ordered that it should be transmitted to the secretary of state :

*Held*, that it is the duty of the courts to treat the act as a law, properly passed and authenticated under the constitution.

4. When a town council is authorized by law to do a particular act at its discretion, the courts will not control this discretion, and inquire into the propriety, economy and general wisdom of the undertaking, or into the details of the manner adopted to carry the project into execution.

5. The holders of bonds or negotiable notes issued to him by a town, under a law authorizing the issue, are not bound to see that all the details provided by the act authorizing the issue have been duly complied with by the corporate authorities.

Municipal corporations. Schools. Constitutional law. Laws. General assembly. Bonds. Negotiable securities. Before Judge HALL. Monroe county. At chambers. December 9th, 1873.

John A. Danielly, Cyrus Sharp, and other tax-payers and citizens of the town of Forsyth, filed their bill against Thomas B. Cabaniss, present intendant, A. D. Hammond, former intendant, B. M. Turner, former secretary and treasurer, S. D. Mobley, present secretary and treasurer, J. S. Lawton, commissioner of said town, B. Pye & Son, W. L. Lampkin and H. G. Bean, bankers, and J. J. Greer, claiming to act as marshal, alleging that they are attempting, without authority of law, to collect of complainants and other citizens $30,000 00 by taxation, defendants claiming this right and power by virtue of a pretended vote of the people of Forsyth, and of certain acts of the legislature. The bill presented the following facts :

In 1871, the president and council of Forsyth negotiated

for the purchase of the "Monroe Female College," in the corporate limits, and of the "Hilliard Male Institute," without the corporate limits, of said town, the terms of the sale being agreed to, but never executed, no deed having been made and delivered to said corporate authorities. Under pretense of raising money to pay for said property, said officers, in October, 1871, held what they called an election; the sole question submitted being whether the town should issue bonds to the amount of $10,000 00, to be sold and the proceeds appropriated to the payment of the purchase money of said property. There was no act of the legislature authorizing, or any laws, general or special, regulating said election. In view of this, many citizens regarded it as a farce, and did not vote; a few only did vote, while a large number, not citizens, did participate. Said election was, therefore, illegal and void, and conferred no power to impose a tax. Yet defendants proceeded to issue said bonds, and have disposed of them in some way unknown; complainants have been informed that they were sold.

On 1st November, 1871, defendants did not issue bonds to the amount of $10,000 00, but notes, bills or currency to the amount of $30,000 00, intended for general circulation, as will appear from the following copy of one of them:

"$10 00.   The city of Forsyth will pay ten dollars to the bearer, with interest from date, at the rate of two per cent. per annum, when presented in sums of one hundred dollars or more. Said notes receivable without interest for all dues, if presented before maturity.   Forsyth, Georgia, November 1st, 1871.        (Signed)

"A. D. HAMMOND, Intendant.

"B. M. TURNER, Treasurer."

They range from ten cents to $10 00, and circulate as currency. They were not sold as bonds are usually sold, but were circulated by Pye & Son and Lampkin & Bean, bankers, who, under an agreement with the town authorities, were to receive $15,000 00 for giving it currency.

After the issue of this money, defendants attempted to give it the appearance of legality by procuring the passage of an act of the legislature, authorizing the council, through their president and treasurer, to issue bonds in such sums as would be a circulating medium and have the similitude of money, to secure its circulation. The bill to accomplish this purpose did not receive the executive sanction, nor was it filed in the office of the secretary of state, and published as required by law. At a subsequent session of the legislature, an effort was made by resolution to give it the force and effect of law, which complainants submit cannot be done under the constitution. Defendants, well knowing their utter want of authority to circulate said money, attempted to uphold the same, and to perpetuate further wrongs upon complainants by invoking the sanction of the legislature, in section 10 of an act, approved August 26th, 1872. This act is unconstitutional and void.

Said bills have only a local circulation, and the holders thereof have notice of their illegality, and are fully cognizant of all the facts alleged. Defendants have issued and circulated at least $30,000 00 of said bills, and complainants are informed and believe that they have made issues in excess of that sum. They refuse to make any report or showing as to the amount issued and circulated by them, only replying that the amount is not sufficient to be worthy of report.

Complainants cannot tell to what extent defendants propose to go in this work of oppression, usurpation and wrong, and unless a court of equity interferes they will have to bear the burden of illegal and unjust taxation, or be harrassed with innumerable suits, if, indeed, a common law remedy can be made available at all. In addition to this, such recklessness and extravagance will impair, if not destroy, the credit of the municipal corporation, which complainants desire to maintain. They had hoped that defendants, seeing the ruinous consequences of the whole proceeding, would have desisted from their attempts to force them to pay taxes to redeem said bills, notes or promises.

They are not only levying the tax which, though large, is

inadequate to the payment of said issues, or the redemption of said bills, but are threatening to vex complainants with annual assessments of a similar, if not more exhorbitant character, which is contrary to equity and good conscience; and having no remedy at law, they ask relief of a court of equity, and pray for the writ of injunction to restrain defendants, their agents, attorneys and successors, from issuing, uttering or circulating said currency, change-bills or bonds having the similitude of money, and from proceeding any further to enforce said tax executions against complainants, or any future tax to redeem or pay off said currency, change bills, bonds, etc.

Complainants disclaim discovery, and pray for a perpetual injunction.

Defendants, by their answer, admit that Greer is the marshal of Forsyth, and that they are attempting to collect the tax executions, but not the sum of $30,000 00.   The council claim the right to levy the tax by virtue of the action of the people and the laws.   They admit that the council, in 1871, made arrangements with the trustees of the two colleges for the purpose of taking stock in said institutions.   They say that deeds were made to said property, and attach copies, which are substantially as follows:   The first deed was executed on the 28th November, 1871, and is from Solon F. Wilder, and other trustees of "Hilliard Institute," to Benjamin M. Turner, and other commissioners of the town of Forsyth, and for the consideration of $5,500 00, conveys to the said commissioners the 55-95th interest in said Hilliard Male Institute—said commissioners to hold the same subject to the following conditions:   "The trustees reserving to themselves the right to control, supervise and manage said Hilliard Male Institute as an institution of learning, elect and choose its teachers, and to pass such rules and regulations as to them may seem best; said trustees agreeing to keep the institution in good repair, and provide an institution suitable to the educational wants of the public."

The second deed recites that the council, having submitted to the legal voters of said town the question of taking stock

in the Monroe Female College and Hilliard Male Institute, and a majority of votes having been cast for subscription, and the legislature having passed an act authorizing the council to issue bonds to enable them to take stock in either or both of said institutions, the trustees of said female college, to-wit: John T. Crowder and others, on the 25th of December, 1871, in consideration of the sum of $9,500 00, conveyed to the town council of Forsyth, stock in the Monroe Female College, valued at $13,000 00, to the amount of a 95-135th interest in the same, but to be under the exclusive manaegment and control of the trustees of the institution and their successors.

The defendants admit that an election was held in October, 1871, but say that the first election was held on 20th November, 1869, on the subject of taking stock in either institution—which submission was advertised in the Monroe Advertiser. It was proposed to take stock for the benefit of the public, in accordance with said act of 11th March, 1869, which gave the council authority to make such subscription in behalf of the town. The election was held in accordance with said act. A majority of the citizens sustained the proposed plan of subscription; seemed to be no objection, as they now remember, except that it would enhance the value of Hillyer's and Asbury's property—each of them having a nominal interest in the college.

It was proposed by said submission to take stock in said institutions to the amount of $7,000 00, the bonds to be negotiated and the money raised, to be expended in repairing the college buildings. The bonds were not available, and the council abandoned that part of the scheme. They deny that many prominent citizens of the town did not vote, or that persons outside the town did vote at said election. This is all a pretext to avoid the burdens of citizenship. These bonds were never used.

The council being unable to negotiate the bonds, or to use them, until the interests of Messrs. Hillyer and Asbury in said college had been purchased, and until a judgment against

the Hilliard Institute was paid off, abandoned the plan submitted, and proceeded to engage to purchase the interests of said Hillyer and Asbury in said colleges, as well as to take up the judgment aforesaid.

The next movement made was at a public meeting in Forsyth, on the 30th August, 1870, all the citizens participating, the main object being to raise, by private subscription, enough to purchase the interests of Hillyer and Asbury, and to devise some means of negotiating the bonds issued as aforesaid. There was not a dissenting voice at the meeting; the people almost unanimously assembled and subscribed a large amount. It was apparent that the people were in favor of taking stock in purchasing the private interests and relieving the indebtedness of the institutions.

The board of trustees procured an act of the legislature authorizing said investment and the issuing of bonds in the similitude of money, to be used as a circulating medium, which was passed, and became a law by failure of the governor to sign, and was duly transmitted to the secretary of state's office. When defendants found that this was not published with the acts, they appealed to the committee to look for it, and it was found in the office of the secretary of state, duly transmitted from the executive department as other acts. They deny that said act was not legally passed, and no bill was signed, or bond issued in the similtude of money, until said act became a law. The act authorized defendants to issue bonds and purchase stock in said colleges in such sums as they might see fit, giving them full power to do what they did, and so anxious were they that the issue should be legal, that they had other acts passed by the legislature before the original act was published, ratifying what respondents had done. Defendants say the bills issued are bonds; that complainants have not attached true copies to their bill. The bonds are used as a circulating medium, but are payable and redeemable at a distant day, and bear interest not to exceed ten per cent. The issue was authorized by the legal voters of Forsyth; the whole scheme, as finally carried out, was submitted at an

Danielly *et al. vs.* Cabaniss *et al.*

election held in Forsyth, on the 21st October, 1871. These propositions were voted on, as before stated, and unanimously carried; no one objecting except a few who represented no interest but their own. In obedience to the acts of the legislature, and the third article and fourth section of the constitution, defendants carried out the proposed plan. In the submission referred to, the female college was valued at $10,000 00, and the Hilliard Institute at $6,000 00. It was necessary to pay Walker's judgment of $2,000 00, to purchase the interests of Hillyer and Asbury, valued at $6,000 00, before the other sum of $7,000 00 could be expended on the buildings. To carry out this scheme, the council had issued bonds as aforesaid in the style of currency, redeemable as aforesaid, for the sum of $30,924 00, fifteen thousand of which was to be redeemed by the council in ten years. To avoid interest on which, and to make them bankable and redeemable at any time in exchange, they loaned of said issue $15,000 00, to B. Pye & Son, W. L. Lampkin, and H. G. Bean, and entered into bonds with them to redeem said town currency whenever presented at their counters, in currency of the United States, or New York exchange, and distinctly stipulated that $15,000 00 so loaned was to be retired by said bankers, whenever $15,000 00 had been redeemed by taxation of the people in ten years; the town being liable only for $15,000 00, said sum being loaned to said bankers, to be redeemed by said bankers and used for their own benefit without interest—the people not to be taxed to redeem—it being understood that $1,500 00 should be redeemed annually by taxation, and a corresponding amount in the hands of said bankers should be destroyed without taxation—giving to complainants the use of twice as much currency as they are required to redeem, and are daily using, notwithstanding they seek to enjoin its circulation, and are daily making money by the circulation. After paying $8,000 00 as stated, and $7,000 00 in repairing the colleges, the town council received stock, and a deed for 55-95th of stock in the Hilliard Institute, and stock in Monroe Female College to the amount of 95-135th interest in the same.

Danielly *et al. vs.* Cabaniss *et al.*

Defendants do not desire to conceal their actings and doings; the tax-payers have always had access to the books of the council; a full and fair report is as desirable to them as to the complainants.    They therefore attach reports of the secretary and treasurer.

Defendants further say that the interests of the citizens of Forsyth, which they hold in the form of stock, is very great, and of the value of $15,000 00, and they are entitled to rents and profits from said institutions.

Defendants further say that said currency has long since passed into the hands of innocent holders, who received the same on the authority of the council to assess the tax and redeem the same.    They have taken it in the course of business and paid full value therefor, all of which was known to complainants before the filing of their bill.

Complainants affirm and defendants deny that these are sectarian institutions.

Defendants offered the affidavit of T. B. Cabaniss, that he was journalizing clerk in 1871 and 1872; that the act authorizing the purchase of stock was placed in the hands of the governor on the 8th December, 1871, with others; it was not approved or vetoed by him, but sent to the secretary of state's office.    A committee was appointed at the session of 1871 or 1872 to look after such bills.    They only reported four of a general nature, but at the July session, 1872, they reported this bill as obtained from the secretary of state's office, and authorized its publication.    This was before the passage of the bill amendatory of the charter of Forsyth.

Before the introduction of this last bill a section was added, at the suggestion of deponent, to legalize the issue of bonds, as he feared that the committee might not report.

Defendants also offered the affidavit of S. D. Mobley, that the showing of the amount of issue, to-wit: $30,924 00, was correct.    Also, the affidavit of R. G. Anderson, who says he was a clerk at the election in October, 1871; that it was fair; that none voted but qualified voters of the town.

Danielly *et al.* *vs.* Cabaniss *et al.*

Upon the hearing of the case, the judge refused the injunction, and complainants excepted.

C. B. WOOTEN; W. A. LOFTON, for plaintiffs in error.

1st. Is the tax sought to be enjoined imposed by proper legislative authority? If not, the injunction should be granted, for valid legislative authority must be shown for every act of taxation: Cooley's Con. Lim., p. 517, (2d ed.)

2d. There is in this case no such legal authority. Defendants rely on section 2 of an act of the legislature, approved March 11, 1869, as the prime source of their power in the premises. This act does not sustain them, because, 1st. It provides for the issue of *bonds* in certain cases, but in no case does it authorize a "circulating medium, or bonds bearing the similitude of money," to be issued, as was done in this instance. 2d. It does not contemplate subscriptions for stock in institutions of learning, the generality of the phrase "or other company," following the word "railroad," being restrained by the context. This construction favored, since (as will be hereafter shown,) it is consistent with the constitution: Winter *vs.* Jones, 10 Ga., 200; Newland *vs.* Marsh, 19 Ill., 384; Clark *vs.* Rochester, 24 Barb., 471.

3d. The only additional legislation relied on by defendants are acts of December, 1871: Acts of 1872, p. 198; and the act of August, 1872: Acts of 1872, p. 197—both passed after the notes were issued. The first of these was to authorize the town council of Forsyth to make certain issues, but it has no application to this case, because the notes in question were issued, not under that act, but before its passage: Senate journals, 1871–'72, p. 189. The second of these acts is void, because it contains matter different from what is expressed in the title thereof: Code, sec. 5056. But if this is not so, it seeks to legalize a currency or "circulating medium" acknowledged to have been issued without authority of law. The legislature could not do this, unless it could have authorized such issue: Cooley's Con. Lim., pp. 379, 380, and notes. The legislature could not have authorized it, because, 1. The election,

by virtue of which it is claimed that these notes were issued, was held on the express condition that the property of colored citizens was not to be taxed; hence, the taxation is not uniform, and is therefore in violation of section 17, bill of rights: Code, sec. 5019. 2. As shown by the deeds, it was a donation or gratuity to sectarian enterprises, and it is therefore in violation of section 6, article 3, constitution: Code, sec. 5065. 3. Again: if any or all of this legislation was intended to confer the power claimed by defendants, then it is for that reason unconstitutional and void: Sec. 6, art. 3, con.; Code, sec. 5067. The words "work of public improvement," in said section, are held as applying to a work of like kind with a railroad, and do not include colleges, etc.: Potter's Dwar. on Stat. and Cons., 236; Sandiman *vs.* Breach, 7 B. & C., 96; 3 D. & R., 20; 1 B. & C., 680. This view is supported by the construction of municipal powers: Cooley's Con. Lim., 211, 212, 213; 1 Dil. Mun. Cor., secs. 105, 106, and notes.

A. M. SPEER; A. D. HAMMOND; T. B. CABANISS, for defendants.

1st. Power of taxation: 1. To raise revenue for the support of the government. 2. To pay public debt. 3. To provide a general school fund. 4. For common defence. 5. For public improvements: Sec. 27, art. 1, of state constitution.

2d. The general assembly may grant the power of taxation to county and municipal authorities, to be exercised within their several territorial limits: Sec. 28, art. 1. A citizen may be compelled to contribute to a work of public improvement: Art. 3, sec. 6, par. 4. As to acts of legislature on this point, see act March 11th, 1869, amending charter of Forsyth. See act passed prior to 9th December, 1871, published in acts of 1872, pages 198, 199, and resolution in same acts, page 528. See, also, as to act ratifying and affirming proceedings of council, act of 26th August, 1872, section 10, page 198. As to authority of legislature to validate and confirm previous acts, see 5 Georgia, 561; 21 *Ibid.*, 275; Dillon on Corporations, sec. 46; 15 Cow. Rep., 475. A

mere irregularity in the exercise of the power will not vitiate the bond: Dillon, secs. 416, 417; 21 Howard, 539; 48 Mo., 167.

McCay, Judge.

1. A municipal corporation, in its very nature, is but a branch of the government. Its object, in this country, has always been to exercise governmental powers in such detail as it would be inconvenient and unwise to commit to the legislature: Code, sec. 1672. The advancement of education is not only by the bill of rights (constitution, article 1, section 27,) declared, in effect, to be one of the objects of government, but there is a special article in the constitution devoted to this subject: Art. 6. No student of the history of this country, from the earliest settlement to the present day, can fail to see that, to furnish facilities for the education of the people, it has not only been the constant practice of both the state and the corporate organizations, to engage in projects for the advancement of education, but that this has been a favorite and preferred object; and it seems to us that more permanent good has come to the country from this application of both state and municipal funds than from any other use of such funds. Nor is this merely an American idea. Some of the very earliest and most flourishing foundations for the advancement of education in England were made by the corporation of London. Even amid the troubles of the Protectorate, during the minority of Edward VI., "the mayor and aldermen repaired and refitted the House of Gray Friars, for the education of poor children, under the name of Christ's Hospital:" Froude's History of England, vol. 5, p. 368. And it is well established by authority, that the building of hospitals, schoolhouses, etc., are within the sphere of the ordinary jurisdiction of a municipal corporation. That the corporation has vested the management in trustees is only a matter of discretion, and where the object is a public one, and private gain not the purpose, we think such a discretion wise and proper. The trustees in this case undertook to keep up the school. No profit

accrues to them. The house is the necessary thing; the public may well furnish that, leaving the school to support itself.

2. There is nothing in the constitution prescribing the time of the assent of the people to an act of the legislature authorising the corporation to engage in a public work. The language is just as applicable, perhaps more so, to the idea that the vote is taken before the act, as the contrary, and there seems to be no reason why either way does not conform to the constitutional provisions. The main idea is to know that the enterprise is approved by the people, by a formal election held under proper rules. In the case of a town or city, where there is a perfect machinery for the purpose, there is just as much, and perhaps more, propriety in coming to the legislature·with the will of the people already ascertained, as to get the act and then learn if the object be approved by the people.

3. There seems to be no law, or rule of either house of the general assembly, providing any mode in which it is authoritatively to be ascertained when a bill is presented to the governor for his signature. And the practice on the subject is not uniform. The fact ought in some way to appear of record, and on the act itself. Some of the governors seem to have made an entry on the enrolled bill; others have left it to the legislature to preserve the evidence. There ought to be legislation on the subject. The facts in this case, we believe, are that the governor made no entry, and none was made by the house. At a subsequent session of the same legislature the matter was inquired into by a committee, and the act in question, after a report of the committee, was declared to have been duly enacted and become a law by the failure of the governor to dissent within the constitutional period, the bill having been passed and presented more than five days before the adjournment. We think this is sufficient authentication of the fact and that the bill was duly passed. Nor do we agree that the 10th section of the act of August 26th, 1872, is in violation of that clause of the constitution requiring all acts to contain but one subject matter, and to conform to the title. The title of the act is to amend the charter and the other acts

amendatory thereof. This is a very large title, and may well include anything increasing, lessening or confirming the powers, or asserted powers, of the town. It would make legislation almost interminable, if every amendment of the charter of a town were required to be in a separate act. Whatever fairly comes within the scope of an amendment to the charter, may, as we think, well be taken to come within such a title. The subject matter is the power and corporate authority of the town—all constitutes one subject matter that may fairly be included within this idea. However doubtful, therefore, may have been the original authority to issue these bills, their issue has been legalized by the legislature. The objection that they were illegal, as falling under the act prohibiting the issue of a circulating medium, is covered by the same sanction. The state may, by its legislative department, sanction and condone a public wrong. Though we doubt if under the acts of 1841, 1851, 1852, 1855 and 1856, making such issues illegal, the illegality of the issue is any objection or excuse for the non-payment of them. These acts are not fully codified in the Code, and under a fair construction of them, it is not by any means clear that the illegality of the issue is a good defense to a suit upon them.

4. As under the law these change bills are not illegal, as it cannot be objected to them that the city had no authority to issue them, it is not the duty of the courts to inquire into the propriety of the issue. That, under the law, is the function of the officers of the town, and it requires a very strong case to invoke the interference of the courts, with the exercise of the discretionary powers of a corporation. Nor can it be set up as against the *bona fide* holders of negotiable papers of this character when the city has authority to issue, that the details of the law have not been conformed to.

5. Upon the whole, whilst we recognize that there has been irregularity in many of the acts of the city council in the matter complained of, yet, there is not such illegality as justifies a refusal to pay the debt contracted, and we affirm the judgment.

Judgment affirmed.