[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

# State, *ex rel.* Crenshaw, *et al. v.* Joseph, *et al.*

## *Quo Warranto.*

(Decided December 21, 1911. Rehearing denied February 15, 1912.
57 South. 942.)

1. *Statutes; Enactment; Approved by Governor; Failure; Adjournment.*—The constitutional provision that if any bill shall not be returned by the Governor within six days after it shall be presented to him, it shall become a law as if he had signed it, unless the legislature, by its adjournment, prevents its return, has in view a final adjournment and not a mere recess.

2. *Same; Failure to Return.*—The time within which the Governor may consider a bill without its becoming a law is measured by calendar days under the constitutional provision that a bill shall become a law, as if signed by the governor, if it shall not be returned by him within six days after presented, Sundays excepted.

3. *Same.*—Under the constitutional provision above referred to the return of the bill contemplates a return while the House is in session, and it cannot be returned to any officer or aggregation of members of the House when not in session.

4. *Same.*—Where a return of the bill by the governor to the House in which it originated is prevented by recess for more than a day, the two days after re-assembling in which it must be returned to the House under the Constitution to prevent it becoming a law without signature, must necessarily be legislative days.

5. *Same; Approval by Governor; Evidence.*—A memorandum made on a bill at the time by the Governor's recording secretary cannot be resorted to to show when a House bill reached the Governor, which was returned with objections to the House by the Governor, in order to determine whether it was so returned in six days as required by the Constitution; as the legislative record, with amendments to obviate the Governor's objection, and the presumptions therefrom in favor of its constitutional enactment are conclusive. Hence, where the legislative record and journals did not, and were not required to show when the bill was presented to the Governor, such memorandum was not admissible to show that the bill was not returned within six days.

6. *Same; Special Laws.*—General Acts 1911, p. 204, General Acts 1911, p. 209, and General Acts 1911, p. 591, are separate statutes, and are not special laws within the constitutional inhibition, although referring to the same general subject, a classification based on population being reasonable.

7. *Constitutional Law; Statutes; Validity.*—Appellate Courts will sustain the validity of an act unless it is clear beyond a reasonable doubt that it violates the Constitution.

8. *Evidence; Judicial Notice.*—The courts take judicial notice of the journal of each legislative house.

9. *Same; Population of Cities.*—The court will take judicial notice that the city of Birmingham was the only city to which General Acts 1911, p. 204, was applicable when the act was passed, it being the only city having a population of 100,000.

(Simpson and McClellan, JJ., dissent.)

APPEAL from Montgomery Circuit Court.

Heard before Hon. W. W. PEARSON.

Information by the State on the relation of C. E. Crenshaw, Jr., and another, in the nature of quo warranto, directed to E. B. Joseph, and the others constituting the City Commissioners of Montgomery. From a judgment for respondent, relators appeal. Affirmed.

ARRINGTON & HOUGHTON, for appellant. The clause limiting the time which an executive has to veto a bill before it becomes a law is in practically every state constitution in the United States, and has been construed by Supreme Courts of other states, though it seems not to have been construed in this state. See latter part of section 125, Constitution 1901. The following authorities are cited as from other states.—45 N. H. 608; *Corwin v. Comptroller,* 6 S. C. 390; *State v. Michel,* 27 South. 656; *Harpending v. Height,* 2 Am. Rep. 432; 175 U. S. 454; 14 A. & E. Enc. of Law, 1102, 36 Cyc. 959; Lewis Sutherland Statutory Construction sec. 62, 64. The constitutional framers evidently recognized a distinction between the two words, adjournment and recess. As to what the distinction is see.—1 Cyc. 792; Web. Internat. Dic.; March's Thesaurus. From an examination of the legislative journals in view of the provision of the constitution above referred to it is plain that the legislature was in session on the sixth day, and stayed in session long enough to give the Governor a reasonable time to have returned the bill.—

*Gardner v. Johnson,* 22 Ala. 501; *Thrower v. Brandon,* 89 Ala. 407; 24 Tex. 137. The record shows conclusively that the bill was not returned until after the six days had elapsed.—Sec. 11, Code 1907; *State ex rel. Porter,* 145 Ala. 547, and authorities supra. The mandates of the Constitution are the supreme law of the land.— *State ex rel. Skeggs,* 46 South. 268; *Board of Revenue v. Crowe,* 141 Ala. 148. The constitution is self executing.—*State ex rel. v. Foster,* 130 Ala. 162. It is competent to introduce parol evidence bearing on the question of presentation and return of the bill by the executive.—Authorities supra, and 36 Fed. 174; 2 Cal. 165; 33 Ill. 9; 87 Miss. 411; 48 Md. 295; 83 Ark. 448; 6 Wall. 499; *Hutchinson's Case,* 43 Ala. 721. The court takes judicial notice of the customs of the legislature.—*Roberson v. The State,* 130 Ala. 164; *Ensley v. Simpson,* 52 South. 66. The fact of adjournment may be shown by parol evidence.—26 Cyc. 552, and authorities supra. The court takes judicial notice of general laws, and of the legislative journals.—6 Wall. 508; 94 U. S. 260; 103 U. S. 683; 107 U. S. 202; *Walker v. Griffith,* 60 Ala. The court erred in putting the burden on plaintiff to show that defendants were illegally holding.— *Jackson v. State, supra; State ex rel. v. Foster, supra; Montgomery v. State,* 107 Ala. 383; 32 Cyc. 1460. The act is a local law.—26 A. & E. Enc. of Law, 620, et seq; 10 L. R. A. 700; *State v. Weekly,* 153 Ala. 648; *Ayars' Case,* 2 L. R. A. 577. The act contains many subjects not fairly indicated by the title, and not germane thereto, found in sections 2, 5½, 7, 8½, 9, 12, 13½, 15, 18½ and 27½.—*Yerby v. Cochran,* 101 Ala. 541; *Hamm v. State,* 156 Ala. 645; *State v. Miller,* 48 South. 496. Section 13 of the bill violates article 7 of the Constitution.—*Touart v. State,* 56 South. 211. The invalid parts are so connected that it cannot be presumed that the

Legislature would have passed any without the others. —*Yerby Case, supra.*

W. A. GUNTER, and JOHN V. SMITH, for appellee. A motion to strike is in the nature of a demurrer, and cannot be supported by proof.—*Weffel Stillman,* 151 Ala. 363. The printed act was certainly prima facie evidence and receivable as such.—Sec. 1661, et seq, Code 1907. There being no rule of law as to presentment of bills to the Governor and return, when this particular bill was returned with the amendment suggested it became the duty of the legislature to inquire into and determine the facts, all of which were in fiieri, relative to the presentation of the bill to the Governor, and its recesses between such presentation and return. It had the authority and it was its duty to do this as a preliminary to acting on the message.—*Sherman v. Story,* 30 Cal. 274; *Dannelly v. Cabaniss,* 52 Ga. 223; *Rumsey v. People,* 19 N. Y. 41. This action of the Legislature within the pale of its authority, and the just exercise of an undoubted jurisdiction is conclusive upon the world. —*People v. McCullough,* 71 N. E. 602; *State, ex rel. v. Jones,* 23 L. R. A. 340; *U. S. v. Aredondo,* 6 Pet. 315, and cases cited; *Voorhces v. Bank,* 10 Pet. 449. The court cannot look behind the journal to invalidate or uphold a statute. The law must stand or fall by the ·record.—*State v. Buckley,* 54 Ala. 509; *Harrison v. Gordy,* 57 Ala. 49; *Walker v. Griffith,* 60 Ala. 364; *Hall v. Steele,* 82 Ala. 562; *Ex parte Howard Harrison Co.,* 119 Ala. 484; *Robinson v. State,* 130 Ala. 164; *State v. Brody,* 148 Ala. 381; 14 L. R. A. 459; 23 L. R. A. 340; 143 U. S. 649; 82 N. E. 1072; 71 N. E. 602. The rule is founded upon two distinct reasons clearly drawn and sufficiently stated in the authorities supra. It

will not do to say that the presentation of the bill to
Mr. Nunnally was a presentation to and receipt by the
Governor of the bill.—99 Mass. 636; 82 N. E. 1072;
71 N. T. 602. The recording secretary can only record
the Governor's acts and cannot perform an official act
for him.—Authorities supra. The House must be in
session when return is made.—Authorities supra. The
word "day" in section 125 means a natural or calendar
day.—Authorities supra, and *Carter v. Henry,* 39 South.
690; *Hyde v. White,* 24 Tex. 137. On these authorities
it must be held that if the House recessed or adjourned
before twelve o'clock on the night of the 29th, such re-
cess prevented the return.—Authorities supra.

SAYRE, J.—This information in the nature of quo
warranto was filed by the appellant Crenshaw, in the
name and behalf of the state, and sought a judicial de-
termination to the effect that defendants were not en-
titled to hold office as commissioners for the city of
Montgomery, as they were assuming to do. By their
answer, defendants justified their assumption of official
power and functions under an appointment by the Gov-
ernor, alleging that their said appointment was made in
pursuance of the act "to provide and create a commis-
sion form of municipal government and to establish
same in all cities of Alabama," etc.; the same being
shown at pages 289-315 of the printed volume of the
General Acts of 1911. The act here referred to pro-
vides for a commission of five, to consist of the then
mayor and four others to be appointed by the Governor,
who should exercise all the powers of the municipal
government. The legislative history of this act, as evi-
denced by the journals of the two houses of the Legisla-
ture and the enrolled act on file in the office of the Sec-
retary of State, is the history of an unimpeachable ex-

ercise of legislative power, as all parties concede, in every respect save one. At one point, a difference of opinion has arisen out of facts which we will here state: House Bill 322, out of which the act in question was developed by a course of legislative action, provided for a commission of three, to consist of the mayor and two others, who should be elected by the people. In this shape, the bill passed both houses and was signed by the Speaker of the House of Representatives and the Lieutenant Governor, presiding officer of the Senate, on March 22, 1911. The journal of the House next shows that on March 31st, the House being then in session, "the House concurred in and adopted the amendment offered by the Governor to the H. Bill 323, said Governor's amendment being as follows;" and here the amendment, which provided, among other things, for a commission of five, is set out at length. The Governor's message bears date March 31, 1911, and was spread upon the journal in pursuance of the Constitution (section 125), which requires in such cases that the House in which the bill originated, and to which it is returned, "shall enter the objections at large upon the journal and proceed to reconsider" the bill. In the meantime, as the journals show, the Legislature, on March 22d, adjourned to the 24th, and on the 24th to the 29th, and on the 29th to the 31st. Of intervening days, March 26th fell on Sunday. The appellant's contention is that, under the Constitution, the bill became a law in its original shape by reason of the Governor's failure to sign or return the same, with the amendments of his proposal to the House of Representatives, within six days, and that what further was done with the bill is of no consequence, as being wholly without the power of the Legislature.

So much of the Constitution as is necessarily involved in the decision of the question presented reads as follows: "Every bill which shall have passed both houses of the Legislature, except as otherwise provided in the Constitution, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objection at large upon the journal and proceed to reconsider it. * * * If any bill shall not be returned by the Governor within six days, Sunday excepted, after it shall have been presented, the same shall become a law in like manner as if he had signed it, unless the Legislature, by its adjournment, prevent the return, it which case it shall not be a law; but when return is prevented by recess, such bill must be returned to the house in which it originated within two days after the reassembling, otherwise it shall become a law." The authorities are unanimous in holding that the adjournment of the Legislature contemplated in the quoted clause of the Constitution is a final adjournment. It seems necessary, also, to hold that the limit of time during the session—that is, where there has been no final adjournment—within which the Governor shall return a bill in order to prevent it becoming a law without his approval and signature, or, perhaps, it would better express the intent of the provision to say the period of time during which the Governor has the right to consider a bill without its becoming a law independently of him, must be measured by calendar days; for otherwise there would be no reason for excepting Sunday, on which day it is not the practice of legislative bodies in this country to sit for the business of legislation. When occasionally Legislatures have found it convenient or necessary to extend their sessions over into Sunday, it has been treated as an ex-

tension of the previous day. But the sixth must be a
legislative day also; for the Governor has six days in
which he may consider the bill, and the requirement is
that the bill, in case it be not approved, be returned to
the house in which it originated. No congregation of
the members of a house can, in a constitutional sense,
constitute the House during the period of a recess, or
exercise any of its constitutional functions. Nor can
the return be made to any officer of the House when it ·
is not in session. As was aptly said by Governor Jones
in a message to the Senate in 1893: "A message from
the executive to either branch of the Legislature, deliv-
ered to an officer of the body, who may not even be a
member, and when it is not in session, for transmission
and delivery to 'the House' when it shall reconvene, is
an anomaly in parliamentary law. Messages from the
executive to either branch of the General Assembly are
invariably delivered to the House while in session, and
not to the officers for them. Such has been the imme-
morial usage, and the same custom obtains concerning
messages from one house to the other. There is neither
parliamentary nor statute law which confers any func-
tions upon the secretary or clerk of either house, while
they are in recess, concerning the reception of mes-
sages from the other house or from the executive. Par-
liamentary law absolutely divorces clerks and secre-
taries from such functions, and is so exacting in this
regard that one house will not receive a message from
the other if the house sending the message is not in ses-
sion. Indeed, it would seem that the express language
of the Constitution, which requires the return 'to the
House,' would repeal any parliamentary or statute law
or custom, if such had obtained, whereby the return
might be made to the clerk or secretary of the House,
while it was not in session, for delivery to it when it

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

reconvenes."—Sen. Jour. 1892-93, 304-310. Like considerations, and others arising out of the fact that during the period of a recess the Governor may find it exceedingly inconvenient, if not impossible, to communicate with the presiding officers of the houses, not to mention the element of unseemliness which may find its way into such an effort, lead to the conclusion that a bill may not be returned to the Speaker of the House or the presiding officer of the Senate in recess. So, then, a bill must be returned to the House while in session, which is to say that the sixth and last day during which the Governor may retain a bill without its becoming a law, if he sees fit to exercise his right of examination to the utmost, must be a legislative day. We conclude, also, that if the house in which a bill originated is in session on the sixth day after a bill has been presented to the Governor, so that the Governor has then an opportunity to return the bill, and there is a failure to return it, his constitutional right to return is exhausted. Any other rule would lead to the result that, with the daily passage of bills originating in either house, the limitation of time would be ineffectual, unless the Legislature should each day remain in session until the last minute of the day—a result not contemplated, of course. But where a return is prevented by recess—an adjournment, not final, but for more than a day—the two days after the reassembling in which the bill may be returned must of necessity be legislative days. On one the house reassembles as an organized body; on the other the bill may be returned to the house so organized.

Relator offered to show by a memorandum made at the time upon the bill by the Governor's recording secretary, and by other parol proof, that the bill reached the Governor's office and was delivered into the hand of

his recording secretary on March 22d, and that this was the customary way of dealing with bills. The bill is not traced directly to the Governor's hand or notice before the 31st, the day on which he returned it to the House. If these facts constituted a presentation to the Governor, within the meaning of the Constitution, and if no rule of law or imperative policy, such as has always prevailed in cases of the character and in view of which the Constitution may be regarded as having been framed, stood in the way of a resort to parol evidence of them, then consideration of the dates to which we have referred, in connection with the interpretation given already to the clauses of the Constitution in question, must result in a judgment denying the validity of the act under which the respondents are holding office.

Cases have been cited from other jurisdictions to sustain the appellant's contention that the presentation shown by the memorandum was a presentation to the Governor. In *Wrede v. Richardson,* 77 Ohio St. 182, 82 N. E. 1072, 122 Am. St. Rep. 498, the ruling was that an entry in a record which was kept in the office of the Governor, pursuant to a requirement of law, and with his acquiescence used to perpetuate evidence of the presentation to him of bills which had been passed by the General Assembly, was competent and sufficient to prove such presentation. In *State v. Michel,* 52 La. Ann. 936, 27 South. 565, 49 L. R. A. 218, 78 Am. St. Rep. 364, it appears that the Constitution of Louisiana contains an imperative provision that, "as soon as bills are signed by the Speaker of the House and President of the Senate, they shall be taken at once, and on the same day, to the Governor by the clerk of the House of Representatives, or secretary of the Senate," and the validity of the act there in question was submitted to the court on an agreed statement of fact which stipulated

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

the day of its presentation to the governor. The bill having been presented to the Governor between 10 and 11 o'clock at night, and the Governor having refused to receive it at that hour, the question litigated was whether such a tender of the bill was a constitutional presentation of it, and whether the fact that the Governor declined then to receive it rendered that presentation nugatory and ineffective. We have no doubt the question was properly decided against the Governor's contentions. So, too, in *Harpending v. Haight,* 39 Cal. 189, 2 Am. Rep. 432, the case was made upon agreed facts which stipulated that on a certain day the bill was, by the enrolling committee of the Senate, delivered to the Governor for his consideration. No question was raised concerning the fact of presentation; whether the Senate, by adjournment, had prevented a return, and whether the court had jurisdiction to compel the Governor, by mandamus, to cause the bill to be authenticated as a statute, are questions which constitute the entire subject-matter of the opinion. The same is true of *State v. South Norwalk,* 77 Conn. 257, 58 Atl. 759. The court in that case took occasion to say that "it [a bill] cannot be deemed to have been presented to him [the Governor] until it has been in some way put into his custody, or into that of some one properly representing him, in such manner that he has a reasonable opportunity to inspect and consider it," citing Opinions of the Justices, 99 Mass. 636. The court further said, "Due provision was made, shortly after the adoption of the Constitution, for such attendance on 'the Governor, or the person administering the office of Governor,' as might serve to secure his proper representation at the executive offices during the sessions of the General Assembly," citing the statutes of Connecticut. The case of *Soldiers' Voting Bill,* 45 N. H. 608, decided by the

Supreme Court of New Hampshire in 1864, holds with the appellant on this point. In that case it was "assumed to be established" that the bill was "carried by the assistant clerk of the Senate to the executive chamber, in the state house, in accordance with the customary mode of presenting bills to the Governor, and was laid upon the table of the Governor, who was then absent from the room, but who had been there during the morning, and was expected to return that afternoon, but did not; that when said bill was thus laid upon the Governor's table some members of the executive council were present, and also Mr. Barrett, the State Auditor, who was the son-in-law of the Governor, and who had a table there in the executive chamber for the transaction of his business, near that of the Governor; that the assistant clerk of the Senate, when he entered the executive chamber with said bill, announced that he had a bill for the Governor." The Governor saw the bill on the next day, and the point at issue was whether there had been a presentation when the bill was laid upon the Governor's table. In brief, the conclusion that the bill had been presented when laid upon the Governor's table was rested upon the absurdity of requiring the officers of the Legislature, in order to perform their duty, "to follow the Governor wherever he may chance to go, whether in the state or out of it, upon his private business as well as public, and present bills to him in person wherever he may happen to be." The clear effect of the decision was that the bill must be deposited in the usual place, and the attention of the Governor, secretary, or other person in charge of the room called to the fact. What different effect was given to the presence of members of the executive council with whom, under the Constitution of New Hampshire, the Governor was required, from time to time, "to hold a coun-

cil for ordering and directing the affairs of the state, according to the laws of the land," or to the presence of the Governor's son-in-law, or whether the janitor would not have served the purpose as well, does not appear. At any rate, the case would seem to permit the authority of legislative acts to rest upon a very uncertain basis. Our own case of *State v. Porter,* 145 Ala. 541, 40 South. 144, is also relied upon. That case drew into question the right of commissioners, appointed by the Governor, to hold an election to locate a county seat under the act of March 3, 1903.—Gen. Acts 1903, p. 117. The act provided for the appointment of commissioners whenever a majority of the qualified electors of a county should "petition the Governor in writing." Relator relied upon a petition of withdrawal. Justice ANDERSON said: "The law provides that the petition must be presented to the Governor, meaning that it must be lodged with him or his official force in some formal manner, so as to become an official document. And section 2 (page 119) of the act requires the Secretary of State to furnish a copy of said petition to the county site commissioners when he issues to them their commissions. Thus it must be observed that this original petition must get within the actual custody and control of the Governor. It therefore stands to reason that, in order for any of the signers to withdraw therefrom, they must do so with a degree of formality corresponding with that contemplated by the law in presenting the original petition." And it was held that a withdrawal petition, presented to Capt. Sedberry, who had been sent by the Governor to Cleburne county to investigate the bona fides of the original petition, but which never in fact reached the Governor's hands, was of no avail. Clearly that case rested upon considerations which have no place in the case at hand; for there

no question of legislative procedure was involved. Per contra to the rule in New Hampshire, in Massachusetts, in a case where the Governor was out of the state when a bill passed the Legislature, the Supreme Judicial Court reasoned that as the duty of revisal by the Governor was a personal duty, with which he alone was intrusted, it was necessary that the bill should be laid before him personally; that the Governor, whose duty it was to sign the bill, was entitled to have it before him, that he might have the opportunity to sign or return it with his objections. In this state, we have no constitutional or statutory provision requiring the presentation to be made to the Governor within any fixed time, nor any requiring an official record of such presentation to be kept. There is therefore no presumption of duty discharged by other officials to set over against the presumption that the Governor has observed the law, nor any record required by law to be kept, on which to place a finding that the bill was presented to the Governor more than six days before its return to the House. What effect the practice of subordinate officers of the two houses to present bills to the Governor's recording secretary and of the Governor's acquiescence in that practice should have in determining the sufficiency of such presentation may be left where we find it, with the apparent weight of reason and authority opposed to appellant's contention; for at some time prior to its return to the House the Governor took cognizance of the bill. The unavoidable question is whether parol evidence should have been received to show the point of time at which presentation was made, and this we have decided upon considerations which will be stated.

Attentive regard for the authorities and the reasons suggested pro and con has convinced us that, whatever

parol evidence may have been available to appellant in support of his contention as to the fact, and however cogent that evidence may seem to the mind uncon-strained by the rules of law and those considerations of vital policy obtaining with the courts whenever they come to the task of passing upon the constitutional val-idity of the acts of the co-ordinate Legislature, we are concluded by the legislative record of the law in ques-tion and the presumptions arising out of that record in favor of its constitutional enactment.

No view can be entertained which would cast the least doubt upon the court's complete acceptance of the doc-trine that the mandates of the Constitution are the su-preme law to all departments of the government. or the court's readiness to enforce the supreme law by declar-ing a legislative act invalid, where that fact is made to appear by competent evidence. But in this case the journals of the two houses and the enrolled bill, signed by the Governor and lodged with the Secretary of State for promulgation as law, present the official history of one continuous dealing with one bill, House Bill 323. On its face, the record is that of a statute valid in every particular of its enactment.   The Constitution requires that each house shall keep a journal of its proceedings, and of the record thus made the courts take judicial cognizance.—*Moody v. State*, 48 Ala. 118, 17 Am. Rep. 28; *Montgomery Beer Bottling Works v. Gaston*, 126 Ala. 425, 28 South. 497, 51 L. R. A. 396, 85 Am. St. Rep. 42.   And the decisions of this court have settled the proposition: "That in determining whether a bill en-rolled, signed by the president of the Senate and the Speaker of the House of Representatives, and approved by the Governor, was in fact regularly and constitu-tionally enacted in all its provisions, and contains all the provisions which were enacted by the General As-

sembly, recourse can be had only to the bill itself as so enrolled, signed, and approved, and to the journals of the two houses of the Assembly. The bill itself, wrought by such enrollment, signatures, and approval into an apparently valid enactment of the legislative department of the government, is a record of its own existence and integrity, in many jurisdictions constituting the only record to be looked to, and carries with it a presumption that it is the bill which the two houses concurred in passing; and this presumption can only be overcome by the contrary being made to affirmatively appear from that other record, the journals—the bound volumes of the proceedings transcribed, and signed by the presiding officers and deposited with and kept by the Secretary of State—of the respective houses of the General Assembly."—*Robertson v. State*, 130 Ala. 169, 30 South. 494. And in *Ex parte Howard-Harrison Company*, 119 Ala. 484, 24 South. 516, 72 Am. St. Rep. 928, the language of the court is: "No other evidence is admissible. The journals can neither be contradicted nor amplified by loose memoranda made by clerical officers of the houses. Nor will it be presumed from the silence of the journals on a matter of which it is proper for them to speak that either house has disregarded a constitutional requirement in the passage of an act, except in those cases where the organic law expressly requires the journals to show the action taken, as where it requires the yeas and nays to be entered." But appellant says it is the elementary duty of the court to know the statute law of the state, though judicial knowledge is not the personal knowledge of the judge, and for that reason he has the right to resort to any source of information which in its nature is capable of conveying to the judicial mind clear and satisfactory information, and it is urged that, since the relator stood ready to

furnish evidence for informing the judicial knowledge,
of greater moral weight than the mere presumption
which arise in favor of the observance by the Legisla-
ture and the Governor of constitutional mandates, and
to the effect that those mandates were not observed in
fact, the court cannot avoid knowing that in fact the
Governor did retain the bill for more than six days
after it had been presented to him without signing it,
and that thus it became law in its original shape.   It
is to be conceded that there may be cases in which the
courts must enter into aliunde investigations as to the
existence of a statute, or as to the time when it received
executive approval by signing, or as to the time when
it became law without such approval (*Walker v. Grif-
fith,* 60 Ala. 367; *Gardner v. Collector,* 6 Wall. 499, 18
L. Ed. 890), though, to paraphrase the language of
Judge Miller in the last-named case, we should reason-
ably expect to find a duty so very important as that of
making some official written statement as to when a
bill is presented to the executive, and when signed by
him, the neglect of which may be followed by the most
serious consequences prescribed by some positive and
express provision of the Constitution, or, at least, by
some act of the Legislature.   The court would repudi-
ate any record or any part of any record which depends
upon forgery or other unlawful interpolation for its
semblance of law, and such forgery or interpolation
might be proved to the court as in the case of any other
instrument which the court is bound to know; and
where the Constitution requires, as a condition to the
validity of a statute, that certain facts in respect to its
legislative history must appear upon the journals, the
court gives effect to the supreme law by declaring void
a statute with a defective record; and where two irre-
concilable laws are approved on the same day, or rights

may depend upon the exact date of an approval which is not denied, nothing appearing in that respect, necessarily evidence is taken to make certain a fact otherwise at large.   Here the case is different.   Appellant does not deny the integrity of the record of the act under which defendants claim; nor does he claim that it is required by any rule of Constitution or statute to show more than it does.   As before said, the statute in its last shape is perfect in its appearance, so far as concerns the regularity of its enactment; and its genealogy shows no break.   The record history of the bill does not end with its first pasasge through the Legislature.   It is resumed at a later day in the journals of the two houses, that of the House of Representatives showing that the bill was returned without approval, and with the proposal of amendments which would meet the Governor's objections.   Subsequent dealing with the bill, down to and including the Governor's approval of it in its last shape, is admitted to have been perfectly regular, if the return was made in time.   Appellant would impeach the effect of the record of the bill in its last shape by evidence in pais of a fact, concerning which a proper record is required to show nothing, contrary to what was the necessary finding of the Governor and the Legislature.   This on a comprehensive theory that judicial knowledge must embrace every act of every official concerned in any way in the business of passing laws.   Now, when the bill went back to the Legislature, it was within both the power and duty of that body to know whether the bill had become a law by reason of the Governor's failure to return it within the time limited by the Constitution, thus foreclosing all right to deal with the subject-matter except by a new bill, or whether the legislation thereby proposed was still in fieri and subject to amendment.   Its power

to proceed depended upon a question of fact which its sworn duty required it to decide, and which it was competent to decide, and which it did decide, thereby establishing, by necessary inference, the fact in accord with the implication of the Governor's return. On such a record, the presumption is conclusive that the facts were consistent with the legislative assumption of power. The principle here applied is set forth in the case of *United States v. Arredondo,* 6 Pet. 691-729 (8 L. Ed. 547), in these words: "It is a universal principle that, where power or jurisdiction is delegated to any public officer or tribunal over a subject-matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject-matter, and individual rights will not be disturbed collaterally for anything done in the exercise of that discretion within the authority and power conferred. The only questions which can arise between an individual claiming a right under the acts done and the public, or any person denying its validity, are power in the officer and fraud in the party. All other questions are settled by the decision made or the act done by the tribunal or officer, whether executive (*[Marbury v. Madison]* 1 Cranch, 170, 171 [2 L. Ed. 60]), legislative (*[McCulloch v. Maryland]* 4 Wheat, 423 [4 L. Ed. 579]; *[Satterlee v. Matthewson]* 2 Pet. 412 [7 L. Ed. 458]; *[Craig v. Missouri]* 4 Pet. 563 [7 L. Ed. 903]), judicial (*[Perkins v. Fairfield]* 11 Mass. 227; *[McPherson v. Cunliff]* 11 Serg. & R. [Pa.] 429 [14 Am. Dec. 642], adopted in *[Thompson v. Tolmie]* 2 Pet. 167, 168 [7 L. Ed. 381]), or special (*[Rogers v. Bradshaw]* 20 Johns. [N. Y.] 739, 740; 2 Dow. P. Cas. 521, etc.), unless an appeal is provided for, or other revision, by some appellate or supervisory tribunal, is prescribed by law." The rule here stated

confines judicial knowledge to the record, where the record is authentic and complete in itself.

This rule is based upon practical considerations of the utmost importance. It would lead to intolerable conditions if the validity of statutes, evidenced in every way provided for authentication by the common law, by the Constitution, and by statutes made to that end, and under which the affairs of individuals and communities may have been long administered, were permitted to depend upon the precarious memory of witnesses and the uncertainties of parol proof. It is clear that if one of the steps necessarily involved in the enactment of a law, and not required by the Constitution to be affirmatively shown, or for the due exposition of which no law has been made, may be shown by evidence in pais not to have been taken, or not to have been taken properly, on the theory that the court knows all such things, "the entire subject of what the law is is withdrawn from the protection of the rules devised and applied for the purpose of securing certainty where doubt would be intolerable. The prompt aversion of the legal mind from the consideration of evidence in pais to show the invalidity of an officially promulgated statute is justified by a contemplation of the consequences which would follow."—*Wrede v. Richardson, supra.* Our conclusion that the trial court properly refused to receive the testimony offered by the relator in impeachment of the act, and that the memorandum stamped by the recording secretary upon the bill as first enrolled is of no consequence, to the extent, at least, it is inconsistent with the course of the Legislature, which treated it as untrue in fact, is required by the necessities of organized society, and is sustained by the weight of well-considered authorities in those states where these and closely allied questions have been carried to

the courts for decision.—*People v. McCullough,* 210 Ill. 488, 71 N. E. 602; *Wrede v. Richardson, supra; Danielly v. Cabaniss,* 52 Ga. 211; *Sherman v. Story,* 30 Cal. 274, 89 Am. Dec. 93; *Rumsey v. People,* 19 N. Y. 41; *State ex rel. Reed v. Jones,* 6 Wash. 450, 30 Pac. 201, 23 L. R. A. 340, and note; *Stevenson v. Colgan,* 91 Cal. 649, 27 Pac. 1089, 14 L. R. A. 459, and note, 25 Am. St. Rep. 230.

At its last session, the Legislature passed four different acts on the subject of commission government for municipalities in this state. On March 31st, the Governor approved an act providing for the appointment of commissioners in all cities now having, or which may hereafter have, a population of as much as 100,000 according to the last federal census, or any such census which may hereafter be taken.—Gen. Acts 1911, p. 204. We judicially know that this act applied at this time to the city of Birmingham alone. On April 6th an act was approved, providing for a commission in cities now having, or which may hereafter have, a population of as much as 25,000 and less than 50,000 according to the last census.—Gen. Acts, p. 289. This act applies to the city of Montgomery alone, as populations now are. April 8th an act was approved for the government by commission of cities and towns which, to quote the act, "now are not, or hereafter may not be, within the influence or operation of any other valid legislative enactment authorizing or adopting the commission form of government."—Gen. Acts 1911, p. 330. Under this act, a commission for the city of Mobile has been organized, and a commission for any other town or city in the state, except Birmingham and Montgomery, might have been organized but for the passage, on April 21st, of an act providing for government by commissioners in all cities now having, or which may hereafter have, a pop-

ulation of more than 1,000 and not more than 25,000.— Gen. Acts 1911, p. 591. The effect of this last enactment was to leave the city of Mobile as the only city in the state which might adopt the commission form of government, as provided in the act of April 8th, and the government of that city has been organized under that act. These acts differ much in detail; but the one broad purpose common to them is to abolish the government of municipalities by mayors and boards of aldermen, and to substitute therefor a board of commissioners to be elected generally by the people, but in all cases, save those provided for in the act of April 8th, the first board of commissioners was to be appointed by the Governor. In the case of cities falling within the operation of the acts of April 8th and 21st, it is provided that a vote of the people be first taken to ascertain whether they desire a change in the form of government. By the acts of March 31st and April 6th, no opportunity is given for an expression of the popular will; but the appointment of commissioners in the first place is made mandatory upon the Governor. On these acts and the differences to be noted in their provisions, some only of which have been mentioned, appellant bases an argument that the act of April 6th is unconstitutional as being a local act. If the act is local it is unconstitutional. It will be observed that these acts, taken together, arrange the cities and towns of the states into four classes: (1) Cities and towns having a population between 1,000 and 25,000; (2) those between 25,000 and 50,000; (3) those between 50,000 and 100,000; and those of 100,000 and over. And provision is made by which cities shift from one class to another as their populations change. The Constitution does not prohibit classification on substantial grounds; and this

court has recognified differences in population as a proper basis for the classification of municipal corporations.—*Griffin v. Drennen,* 145 Ala. 128, 40 South. 1016. But in *State v. Weakley,* 153 Ala. 648, 45 South. 175, ruling here, too, in accord with the authorities generally, it is held that indiscriminate classification as a mere pretext for the enactment of laws essentially local or special cannot be allowed. The argument for appellant is that there are no essential differences between cities of these different classes, such as call for differences in the regulation of their municipal powers and local government; and, further, that these four acts are in pari materia, and must be construed as one act, and that, when considered so and in connection with well-known agitations of public opinion going on at the time, it is apparent that the purpose was to legislate to meet local conditions and demands, rather than to frame a code of laws applicable to all cities similarly situated. It is our duty to sustain these acts, unless it is clear, beyond a reasonable doubt, that they violate some provision of the fundamental law. The argument against them presents a novel application of the doctrine of construing statutes in pari materia. To link a number of separate acts together, each unobjectionable in itself, for the purpose of destroying all or any of them, would, so far as we are advised, be without precedent. We think rather that each of these acts is to be judged on its merits as they appear in the act itself. Classification by numbers having been recognized as legitimate, it must be a task of great difficulty to say just when the Legislature has overstepped the bounds of its power in arranging a classification on that basis. And while our knowledge, in an undefined and irresponsible way, of conditions and opinions operating upon the Legislature at the time of these acts may be

such as to create suspicion that the effort was to provide differently for each of the three largest cities of the state on consideration of local demands, not based on essential differences of situation or the real interests of their inhabitants, we cannot look beyond the act itself for motives. A case might occur in which this basis of classification might be pushed so far that the court would be required to pronounce it unconstitutional. The Supreme Court of Pennsylvania, whose decisions on this subject we have followed, found such a case in *Ayar's Appeal,* 122 Pa. 266, 16 Atl. 356, 2 L. R. A. 577; but we think that condition is not sufficiently demonstated by this statute. In form, at least, the act is not open to the objection taken to it. The range of numbers in the class in which the city of Montgomery falls is fairly large; and we are unable to say with perfect assurance that the Legislature may not have found differences between cities of this class and others having populations of less than 25,000 or more than 50,000 which justified differences in organization and local regulation. While not disposed to encourage this character of legislation, we cannot in this case say it transcends the constitutional power of the Legislature, and so are constrained to withhold interference.

Our conclusion is that the judgment of the court below must be affirmed.

Affirmed.

MAYFIELD and SOMERVILLE, JJ., concur. DOWDELL, C. J., not sitting.

ANDERSON, J.—While concurring in the conclusion and in the affirmance of the judgment of the trial court, I wish to ground my action in doing so upon reasons other than those advanced in the opinion of my Brother

SAYRE. I think that it may be conceded that there was such a presentation to the Governor on March 22d, as disclosed by the stamp upon the bill by the recording secretary of the Governor, and his receipt for same upon the book kept by the enrolling clerk of the House, and that the position assumed by Justices SIMPSON and Mc-CLELLAN on this proposition is sound; yet I am of the opinion that the bill so presented did not become a law because of a default on the part of the Governor in failing to return the same within the time prescribed by section 125 of the Constitution of 1901.

Section 125, among other things, provides: "If any bill shall not be returned by the Governor within six days, Sunday excepted, after it shall have been presented, the same shall become a law in like manner as if he had signed it, unless the Legislature, by its adjournment prevent the return, in which case it shall not be a law; *but when return is prevented by recess, such bill must be returned to the house in which it originated within two days after the reassembling, otherwise it shall become a law,*" etc. (Italics mine.) It is manifest that the Governor is given six full calendar days; therefore, excluding March 22d and the intervening Sunday, the sixth day was March 29th, and the Governor had all of that day within which to get it to the House, and could not be in default, unless the House was in session contemporaneously with the expiration of his time. If the House is at recess upon the expiration of the time given the Governor for the consideration and retention of bills, he then has two legislative days after the House reassembles within which to return bills. All seem to agree that the six days, which excludes Sunday, means calendar, as distinguished from legislative days, and that the other two days given mean legislative days; then, to my mind, it would be mon-

strous to charge the Governor with calendar days in
computing the time, and at the same time credit him
only with legislative or fractional calendar days, for
the purpose of striking down a solemn legislative enact-
ment. In other words the contention is that the Gov-
ernor must return the bill within six calendar instead
of legislative days, yet when the sixth day arrives, and
although he is given six full days within which to re-
turn the bill, he is in default if he fails to get it to the
House while in session on said sixth day, notwithstand-
ing it may assemble early in the morning and recess or
disburse within a few minutes thereafter and until some
future day. To adhere to this contention, as some of
my Brothers seem inclined to do, is not only incon-
sistent, but is, to my mind, violative of the letter, spirit,
and intent of section 125 of the Constitution. The Con-
stitution does not give the Governor five full calendar
days and so much of the sixth day only as may be cov-
ered by the session of the House on said day, but gives
him six full days, whether the House is or is not in ses-
sion; and he is only required to get it to the House on
said sixth day, in case it happens to be in session up to
the expiration of same, or until 12 o'clock that night.

"Recess" has a plain and well-known meaning, when
applied to legislative bodies. It is defined in Webster's
International Dictionary, par. 3, as follows: "Remis-
sion or suspension of business or procedure; intermis-
sion, as of a legislative body, court, or school." I doubt
if there was a single member of the constitutional con-
vention who entertained the slightest doubt that recess
did not mean every intermission or suspension of the
legislative body, as distinguished from the previously
known Christmas holiday; and they did not mean to
make it cover and apply only to the customary Christ-
mas holidays, for the reason that the same convention

changed the time for the legislative sessions from November to January, thus, in effect, practically excluding Christmas. It was evidently intended that "recess" should cover any suspension or remission of either house short of a final adjournment, whether it be from one day to another, one week to another, or one month to another. Therefore, if the House was not in session up to 12 o'clock of the night of March 29th, the Governor was necessarily prevented from returning the bill, if he saw fit to consider and hold it the full time given him under the Constitution; and he had two legislative days after the reassembling of the House within which to return said bill, and which the record shows he did. "Words of common use are to be understood in their natural, plain, ordinary, and genuine signification, as applied to the subject-matter of the enactment."—Endlich, Interpretation of Statutes, § 2, "When the language is not only plain, but admits of but one meaning, the task of interpretation can hardly be said to arise (and these incidental rules which are mere aids, when the meaning is clouded, are not to be regarded.) * * * It is not allowable, says Vattel, 'to interpret what has no need of interpretation.' The Legislature must be intended to mean what it has plainly expressed; and consequently there is no reason for construction."— *Parks v. State,* 100 Ala. 653, 13 South. 756.

The Journal does not recite the arrival of 12 o'clock and the adjournment of the House, but merely shows that the House adjourned on the night of the 29th of March, and is silent as to the hour; therefore it did not adjourn after 12 o'clock, but must have adjourned before the 30th, and presumably before 12 o'clock, and it was not therefore in session contemporaneously with the expiration of the time given the Governor within which to return the bill. This presumption is strength-

ened by the subsequent receipt and consideration of the bill, and which was a legislative determination that the Governor was not in default on the night of the 29th, and that a return of the bill on said night was prevented by a recess of the House before his time for returning same had expired. Nor do I think that the trial court erred in refusing to appellant the right to show by parol that the House adjourned the morning of the 30th, instead of on the 29th of March, as recited in the Journal, as this would impeach or contradict the legislative record by parol, and which should not be permitted.

It is my opinion that the act in question was legally passed, and that the act, as presented to the Governor on March the 22d, did not become a law. I therefore concur in the affirmance of the judgment of the circuit court.

SIMPSON, J.—(dissenting.)—I hold that, even though the law may not specifically provide how the record shall be kept in regard to bills which are passed and transmitted to the Governor for approval, yet, if a record is in fact kept and preserved in connection with the proceedings of the Legislature, the court should have the benefit of that record in tracing the history of the bill. If it is true that a book is kept by the clerical officers of the Legislature, in which the recording secretary of the Governor signs receipts for bills when presented, and that book is, with the other papers required by law to be filed in the office of Secretary of State, filed in said office, said book should be admitted in evidence by the court.

I hold, also, that the record kept by the recording secretary of the Governor, showing the dates when the bills are presented to that office, and his official stamp on the bill, should have been admitted in evidence. These

are not in the nature of parol testimony, but constitute the official record of the history of the bill, through its various stages, until it becomes a law.

For these reasons, I dissent from the opinion of the majority of the court.

McCLELLAN, J.— (dissenting.) —The journals of the House of Representatives and of the Senate show that House Bill 323 was signed by the Speaker of the House and by the President of the Senate on March 22, 1911. Its title foreshadowed an act "to provide and create a commission form of government and to establish same in all cities of Alabama which now have, or may hereafter have, a population of as much as twenty-five thousand and less than fifty thousand," etc. It also appears from these journals that on March 22, 1911, the bodies adjourned to March 24, 1911; that on March 24, 1911, they adjourned to March 29, 1911; and that on March 29, 1911, they adjourned till March 31, 1911.

It is conceded that there is no allusion in the journal of either body to House Bill 323 on March 24th and March 29th, the days on which the bodies were in session. On March 31, 1911, the House Journal recites that the House concurred in and adopted the amendment proposed by the executive to House Bill 323, setting out the amendment proposed by the Governor, as well as the executive's message, dated March 31, 1911, in that connection.

The respondents would justify their tenure of the offices of commissioners of the city of Montgomery upon the proposition that the amendment proposed by the executive on March 31, 1911, became a part of the act establishing the commission form of government in the city of Montgomery.

[State, ex rel. Crenshaw, et, al. v. Joseph, et al.]

Under the bill as signed by the presiding officers of the two houses on March 22, 1911, two commissioners, with the mayor, were to constitute the governing body of the city; the two commissioners to be elected by the people. The amendment proposed by the executive provided for a commission of five, four of them to be appointed by the executive, and the then mayor to be the fifth.

The relator (appellant) insists that the amendment proposed on March 31, 1911, by the executive, and on that date adopted by the houses, never became a part of the act in question, for the executive's failure or inaction for more than six days after the presentation of the bill to sign it, or to veto it, or to propose an amendment thereto, according to the requirement of section 125 of the Constitution, operated to impress the act, as signed by the presiding officers of the two houses on March 22, 1911, with the character and quality of a complete statute, incapable of change or amendment or repeal, save in and by recourse to the constitutional methods of changing, amending, or repealing that which is already *law*.

It thus appears that the solution of the issue presented is to be found in the determination of the inquiry, Did the amendment proposed, March 31, 1911, by the executive become *law*? *What is the law* is a matter, necessarily and in respect of *finality* of pronouncement, committed for decision to the judicial department of the government, when properly invited to do so.— Cooley's Const. Lim. pp. 76, 77, 131, 133, 228; *Walnut v. Wade,* 103 U. S. 683, 689, 26 L. Td. 526; *Town of South Ottawa v. Perkins,* 94 U. S. 260, 267, 24 L. Ed. 154; 8 Cyc., pp. 806, 807, 843.

In this instance, the judicial function is invoked to determine whether the amendment suggested by the

executive became *law* under procedure conformable to constitutional requirements. It is only by observance of those requirements that *law* may be enacted; and whether such requirements have been observed in the given case is the subject of judicial inquiry and determination.—*Jones v. Hutchinson*, 43 Ala. 721, 724, 725; *Moog v. Randolph*, 77 Ala. 597, 599; Cooley, pp. 186, 187; *Gardner v. Collector*, 6 Wall. 511, 18 L. Ed. 890; *Town of South Ottawa v. Perkins*, 94 U. S. 260, 268, 269, 24 L. Ed. 154. Whether these constitutional requirements were, in a particular instance, observed is a question solvable alone by the court in the lights of its *satisfactorily advised judicial knowledge*, and so necessarily excluding the advice or service of a jury in deciding it.—*Town of South Ottawa v. Perkins, supra; Gardner v. Collector, supra; Jones v. United States*, 137 U. S. 202, 216, 11 Sup. Ct. 80, 34 L. Ed. 691; *Walnut v. Wade*, 103 U. S. 689, 26 L. Ed. 526. The *means* whereby the judicial mind is so advised as to be able, consistently with the irrefutable presumption and assumption that the courts know the law, to respond to the inquiry involving the *existence* of a statute, etc., is, in a sense, *evidence*, leading to a finding of *law*, not of *fact*.—*Walnut v. Wade*, 103 U. S. 689, 26 L. Ed. 526. "Any particular state may, by its Constitution and laws, prescribe what shall be conclusive evidence of the existence or non-existence of a statute; but the question of such existence or non-existence being a judicial one in its nature, the mode of ascertaining and using that evidence must rest in the sound discretion of the court on which the duty in any particular case is imposed."

Of the character, generally speaking, of the evidence, properly advisory of the judicial mind in respect to matters of judicial cognizance, it is said in *White v.*

*Rankin,* 90 Ala. 541, 8 South. 118: "If the cognizance extends beyond actual knowledge, the judge may resort to any authoritative sources of information, and inform himself of the fact in any way he may deem best, in his discretion," etc. In *Gardner v. Collector, supra,* it was said "that, whenever a question arises in a court of law of the existence of a statute, or of the time when a statute took effect, or of the precise terms of a statute, the judges who are called upon to decide it have a right to resort to any source of information which in its nature is capable of conveying to the judicial mind a clear and satisfactory answer to such question, always seeking first for that which in its nature is most appropriate, unless positive law has enacted a different rule." The doctrine of this decision was favorably noted in *Walker v. Griffith,* 60 Ala. 367. To like effect is *Town of South Ottawa v. Perkins,* 7 Ency. of Ev. pp. 961-963, 1031, and notes thereon.

It is hardly necessary to add that rules of law pertaining to the introduction or admissibility of evidence in trials of ordinary issues of fact have no effect or bearing, when the judicial mind seeks or is seeking to avail of information to enable it to exercise judicial knowledge.—7 Ency. of Ev. p. 879, and notes thereon.

Under our organic law, to the executive is apportioned an important part in the performance of the legislative function. And it is entirely plain from the Constitution that the executive cannot delegate *his* part in the legislative process to anyone; for it is to the judgment of the person lawfully exercising the authority of the executive that the Constitution commits so much of the legislative function as it imposes upon the executive. The particulars and the extent of that legislative function, thus imposed upon the executive, is, so far as

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

affects the present inquiry, to be found in section 125 of the Constitution. The section (125) is as follows:

"Every bill which shall have passed both houses of the Legislature, except as otherwise provided in this Constitution, shall be presented to the Governor; if he approve, he shall sign it; but if not, he shall return it with his objections to the house in which it originated, which shall enter the objections at large upon the journal and proceed to reconsider it. If the Governor's message proposes no amendment which would remove his objections to the bill, the house in which the bill originated may proceed to reconsider it, and if a majority of the whole number elected to that house vote for the passage of the bill, it shall be sent to the other house, which shall in like manner consider, and if a majority of the whole number elected to that house vote for the passage of the bill, the same shall become a law, notwithstanding the Governor's veto. If the Governor's message proposes amendment, which would remove his objections, the house to which it is sent may so amend the bill and send it with the Governor's message to the other house, which may adopt, but cannot amend, said amendment; and both houses concurring in the amendment, the bill shall again be sent to the Governor and acted on by him as other bills. If the house to which the bill is returned refuses to make such amendment, it shall proceed to reconsider it; and if a majority of the whole number elected to that house shall vote for the passage of the bill, it shall be sent with the objections to the other house, by which it shall likewise be reconsidered, and if approved by a majority of the whole number elected to that house, it shall become a law. If the house to which the bill is returned makes the amendment, and the other house declines to pass the same, that house shall proceed to reconsider it, as

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

though the bill had originated therein, and such proceedings shall be taken thereon as above provided. In every such case the vote of both houses shall be determined by yeas and nays, and the names of the members voting for or against the bill shall be entered upon the journals of each house, respectively. If any bill shall not be returned by the Governor within six days, Sundays excepted, after it shall have been presented, the same shall become a law in like manner as if he had signed it, unless the Legislature, by its adjournment, prevent the return, in which case it shall not be a law; but when return is prevented by recess, such bill must be returned to the house in which it originated within two days after the reassembling, otherwise it shall be a law, but bills presented to the Governor within five days before the final adjournment of the Legislature may be approved by the Governor at any time within ten days after such adjournment, and if approved and deposited with the Secretary of State within that time shall become law. Every vote, order, or resolution to which concurrence of both houses may be necessary, except on questions of adjournment and the bringing on of elections by the two houses, and amending this Constitution, shall be presented to the Governor; and, before the same shall take effect, be approved by him; or, being disapproved, shall be repassed by both houses according to the rules and limitations prescribed in the case of a bill." 

Omitting consideration of "appropriation bills," for which special provision is made (section 126), the executive may, within the time prescribed, take one of several courses, as he may be advised, with respect to a bill presented to him, viz.: (a) Permit it to become a law by withholding therefrom his approving signature until the period prescribed has elapsed; (b) approve the bill

by signing it within the period prescribed; (c) return
the bill, without signing and within the period pre-
scribed, to the house in which it originated, with his ob-
jections thereto and such amendments as would obviate
his objections; (d) within the period prescribed return
the bill to the house originating it, proposing no amend-
ment which would remove his objections. The last two
alternatives are, in effect, affirmative disapprovals—a
veto—though the subsequent legislative course is differ-
ent in the two instances. In the former, it is the legisla-
tive right to consider and determine whether the amend-
ment seasonably proposed by the executive shall be ac-
cepted by the legislative bodies; while in the latter the
legislative right is to decide whether the bill shall pass,
notwithstanding the seasonably expressed executive ob-
jection, in which event, to make the bill a law, a major-
ity of the elected membership of each house must vote
to that end. The alternatives enumerated are executive
prerogatives, the exercise of which no other department
of the government can hinder or impair, much less de-
feat. And it is the duty and supreme province of the
judicial department, in its proper sphere of interpreting
the Constitution and of deciding what is the law, when
properly invited to so determine, to pronounce in ac-
cord with the requirements of the organic law, and to
protect and effectuate the powers and functions assured
thereby to each department of the government.

It is not open to question or to doubt that the refer-
ence to *adjournment,* in section 125, is to *final adjourn-
ment*—the end of (for) the *session* stipulated in the or-
ganic law; and that the reference to *recess* is to suspen-
sions of legislative deliberation (by the house to which
the executive return of the bill may be made) for some
measure of time beyond *one day.* It is equally as clear
that the return of a bill, by the executive, must be to

the body—the house—in its organized capacity, and not to an official, or other representative, of the body to which the executive may make, within his prerogative, his return of the bill.

Three periods, two controlled by contingencies, are allowed the executive for his action or nonaction, leading to the legislative consequence before indicated. He must, if he would prevent the bill's becoming a law by his nonaction, properly return it "within six days, Sundays excepted." Since Sundays are expressly excepted, and since that day is universally respected by all the departments of the government, it is clear that the *six-day* limitation for the return of bills contemplates calendar days. But since, also, the executive return of a bill must be to the house originating it, when in session, to avail of the power given him to that end, the return on the last or sixth day must be effected, if that body is in session, on that day; hence to that extent the *full* calendar day, on the sixth day, must yield to the other mentioned requirement of the organic law. If such was not the rule, the limitation of *six days* for the executives action would be prolonged beyond that expressly provided for by the Constitution. The general publicity of legislative action, the proximity, though separate, of the executive offices to the places of legislative deliberation, and the necessarily constant communication, in the discharge of the respective public duties with which those departments are mutually concerned, between those departments refute the suggestion that either body of the lawmaking department could assemble on a day without such knowledge of the executive as would enable him to return a bill as he might be advised.

If the house in which the bill originated is *in recess* on the sixth day after the presentation of the bill to the executive, *two days* after reassembling are allowed him

in which to return the bill, which opportunity for action, if not availed of, permits the bill to become a law. The two days thus stipulated must, in consequence, be days on which the body originating the bill is in session.

There is still another period provided for in section 125, and that relates to the limitation for the *approval* of bills by the executive after *final adjournment* of the *Legislature*. That period is *ten days*. These are calendar days of course; no return to the body originating the bill being contemplated or possible. But this period is conditioned on the presentation of the bill to the executive "within five days before final adjournment of the Legislature.' Obviously the stated *five-days* prescription is a *condition precedent* to the executive right to *approve and deposit* the bill, *as a law,* with the Secretary of State, during the *ten days after final adjournment.*

It is insisted by counsel for the respondents that the *presentation* prescribed in section 25 contemplates and requires that bills be "presented in fact to the Governor in person," and this upon that which is unwarrantably (though in the abstract it is obviously sound) assumed to be the premise, viz., that in the process of legislation the executive's undelegable judgment and discretion is the constitutional intent. That contention is wholly untenable upon reason and authority.

The transmission of a bill from the Legislature to the executive is particularly referred to five times in section 125. This act of transmission is required, in four instances, by the use of the term "presented." In prescribing what shall be done with a bill to which the executive have proposed amendment, and in which amendment. both houses concur, it is written, "the bill shall again be sent to the Governor *and* acted on by him as

other bills." While the direction for transmission is there prescribed by the word "sent," the immediately following provision expressly commits the bill, so amended upon the executive's proposal, to the identical category, subjects it to the same provisions, in which are "other bills;" and thereby clearly negativing any notion that bills amended by the Legislature, on the seasonable proposal of the executive, occupy any character or status, with respect to executive action, different from that of "other bills." It is evident from this use of "sent," as stated, that the Constitution makers never intended, through the mere employment of "presented," to invest the process of transmission of a bill to the executive with the strictness a literal translation the term "present" in some instances imports. In short, the use of "sent," in reference to the same character of act with respect to which "present" is employed is forceful to show that "present" was not regarded as having any particular, strict significance; and that the obligation imposed on the Legislature is discharged when a bill that has been passed is "sent to the Governor," a distinct conceit from that expressed in the literal interpretation of the personal proffer or delivery of it to the executive, wherever he may be searched out and found. "Presented" has had place, in the connection with which we are now concerned, in each of our Constitutions since the admission of the state into the Union. In the natural order of things, every bill passed by the Legislature (or General Assembly, as formerly called) during *90 years* of the states life has invoked the construction, observance, and application, in legislation, of the provision of the organic law of which *presentation* of bills to the executive has been and is now, in substance, a part.

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

Contemporaneous and practical construction or interpretation of constitutional provisions by the executive and legislative departments of the government will and should be considered by the courts in passing upon constitutional questions; and, though not accepted, except as to questions of a discretionary character, by the courts as conclusive, such practical, contemporaneous construction by departments particularly charged with the observance or execution of the provision under consideration, and acquiesced in for a great period of time, is of peculiar potency in the make-up of the judicial construction, provided the practice be not in contravention of the clear constitutional intent.—Cooley, pp. 102-107; 8 Cyc. pp. 736-739, and notes thereon. If, under a constitutional provision with the observance or execution of which the executive and legislative departments are concerned, a distinct practice has been observed or prevailed, it cannot be a matter of doubt that the reordination of the provision in a subsequent organic law necessarily brings with it for the consideration, by way of advice, of the judicial mind, in the interpretation or construction of that provision, the well-understood practice which has been pursued by those departments in the effort, in presumed good faith, to carry out the mandates, and to respect the restraints, of the Constitution, unless, of course as has been stated, the clear intent of the provision, when read in the light of the whole instrument, forbade or forbids the practice so pursued. If, as has been ruled by the highest judicial authority in our country, general customs and usage have the force and effect of law, if not opposed to positive law (*United States v. Arredondo,* 6 Pet. 691, 8 L. Ed. 547; *Slidell v. Grandjean,* 111 U. S. 412, 421, 4 Sup. Ct. 475, 28 L. Ed. 321), obviously the best wisdom commends to the judicial mind, called to interpret consti-

tutional provisions, of long existence and execution, of the class now under judgment, the ascertainment and consideration of the practice thereunder by those whose duties required their observance or excution of such provisions. Reason not only suggests this aid to constructions, but that and a proper regard for orderly processes in government demand the taking account thereof as a conservative means of discovering the *true* constitutional intent. The principle has been pointedly recognized by this court in *Taylor v. Hutchinson,* 145 Ala. 202, 206, 40 South. 108; *Ex parte Hardy,* 68 Ala. 303, 318; *Moog v. Randolph,* 77 Ala. 597, 606; *Farrior v. New Eng. Mortg. Co.,* 88 Ala. 275, 279, 7 South. 200.

In determining whether the presentation, under section 125, of bills that have passed the houses to the executive requires their proffer or delivery to him *in person,* or whether the constitutional prescription is met by the lodgment of bills that have passed the houses in the executive office, *and* with a member or members of the executive secretarial force, it is the duty of the court, called to construe and to interpret and to give effect to the constitutional requirement of such long existence and obligation, to advise itself of the practice pursued by those departments of the government in respect of the transmission of bills to the executive.

Besides numerous persons who have served in the legislative department, and who have been long familiar with the process of transmission of bills to the executive, our citizenship at this time numbers five former executives of the state, viz., Hon. Rufus W. Cobb, Thomas G. Jones, Joseph F. Johnston, William D. Jelks, and Braxton B. Comer, who, with the present executive, Hon. Emmet ONeal, are peculiarly favored to speak, and that with every assurance of the utmost

credibility, with reference to the practice of the presentation of bills for executive consideration, and so for periods, though disconnected prior to 1896, beginning in 1878 and extending to the adjournment of the Legislature in 1911, covering approximately 20 years of the life of the state. One of these eminent citizens, Hon. Thomas G. Jones, was a member of the convention which wrote the present Constitution, and chairman of the committee reporting section 125, among others, of that instrument. From these sources, together with such pertinent and reliable documentary matter as may be available to satisfy the judicial mind, should this court seek for information as to the practice in respect of the presentation of bills to the executive consideration.

If, as the writer is advised, the long-recognized general practice in the premises has been to lodge bills that have passed the houses in the executive office with one or more of his official force, its receipt and the date thereof being noted by the receiving official upon the enrolled bill, or entered in a book kept for that purpose, or both being done, and no practice to the contrary is discoverable, the plain duty of this court appears; and that is to accept the interpretation of the constitutional provision that has thus long prevailed and hence pronounce such a lodgment of a bill in the executive office, with his official force, a valid presentation, within the Constitution, squaring with the obviously sound and immediately authoritative ruling made in the comparatively recent decision of *State ex rel. v. Porter,* 145 Ala. 541, 547, 40 South. 144, 145, where it is said, Justice ANDERSON writing: "The law provides that the petition must be *presented* to the Governor, meaning that it must be lodged with him *or his official force in some formal manner, so as to become an official document."*

(Italics supplied.) In that instance, the personal, nondelegable, judgment of the executive on the matter of the petition was the law's prescription, just as, in the performance of his constitutional function with respect to the making of laws, the executive personally must determine the matters within his prerogative.

If "presented," in section 125, is interpreted to mean and require the proffer or delivery of the bills to the executive *in person,* patently no statute can be *constitutionally* enacted that would or could permit the presentation of bills other than to the executive *in person.* So that the consequence of that conclusion upon the meaning of "presented," in section 125, cannot be qualified or temporarily avoided by recourse to or hope for legislative relief from the condition thus wrought; nor could the executive delegate to one or more of his official force the power to accept, in his stead, presentations of bills that have passed the houses.

The meaning and effect of the constitutional requirement for the *presentation* of bills to the executive, and when there has been such *presentation* as the organic law contemplates, was considered, in 1864 in the opinion of the justices on the constitutional validity of the *soldiers' voting bill,* 45 N. H. 607, 611, 612. One of the concrete questions propounded to the justices was this, "(3) When was said bill presented to the Governor?" Treating the inquiries submitted "as upon a case stated," the opinion thus rehearses the facts assumed to be established: "That said bill originated in the House of Representatives, passed both branches of the Legislature, was duly engrossed, signed by the presiding officers of both branches, and about noon on Wednesday, August 17, 1864, was carried by the assistant clerk of the Senate to the executive chamber, in the state house, in accordance with the customary mode of presenting

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

bills to the Governor, and was laid upon the table of the Governor, who was then absent from the room, but who had been there during the morning, and was expected to return that afternoon, but did not; that when said bill was thus laid upon the Governor's table some members of the executive council were present, and also Mr. Barrett, the State Auditor, who was the son-in-law of the Governor, and who had a table there in the executive chamber for the transaction of his business, near that of the Governor; that the assistant clerk of the Senate, when he entered the executive chamber with said bill, announced that he had a bill for the Governor; that the Governor saw said bill on Thursday, August 18th, when he came into the executive chamber and found it upon his table there; that both houses adjourned from Saturday, the 20th, to Tuesday, the 23d, of August, and were not in session on Monday, August 22d; that, on Wednesday, August 24th, in the afternoon, the Governor sent a message to the House of Representatives by Mr. Sinclair, a member of said House, who gave notice to the speaker, in the House, when in session, that he had a message from the Governor to present; that the Speaker declined to receive it from him; that said message was not received by any action of the Speaker or of the House, and was not read in their hearing, but that, near the close of the session that afternoon, while the yeas and nays were being taken on a motion to adjourn, which was decided in the affirmative, the Secretary of State laid said message on the Speaker's table, stating it to be a message from his excellency, the Governor; that this message was not opened or read in the House, but was afterwards, on a subsequent day, referred to a select committee; and that in this message of the Governor he stated his objections to the bill in question, and returned said bill therewith to the House."

[State, ex rel. Crenshaw, et al. v. Joseph, et al.]

The constitutional provision [part 2, art. 43] involved was as follows: "Every bill which shall have passed both houses of the General Court, shall, before it becomes a law, be presented to the Governor. If he approve, he shall sign it; but if not, he shall return it, with his objections, to that house in which it shall have originated.   *   *   *   If any bill shall not be returned by the Governor within five days (Sundays excepted) after it shall have been presented to him, the same shall be a law in like manner as if he had signed it, unless the Legislature, by their adjournment, prevent its return, in which case it shall not be a law."

It thus plainly appears that a vital factor to proper response to the inquiries submitted, specially that quoted above, was the determination whether the *presentation* required was a proffer or delivery of the bill to the Governor *in person*, the facts showing that the bill did not come to the Governor's *personal* notice or attention until *August 18, 1864*; whereas, the bill was transmitted on August 17, 1864, to the Governor's office and "laid upon the table of the Governor, who was then absent from the room," not returning thereto, as had been expected.

The justices ruled that the bill was presented on August 17, 1864; whereas, had a presentation to the executive *in person* been the mandate of the organic law, the bill there under consideration would have been held *not* presented until August 18, 1864, the day and date the executive saw the bill. It was there said: "But it would be absurd to hold that the officers of the Senate and House of Representatives are obliged, in order to perform their duty, to follow the Governor wherever he may chance to go, whether in the state or out of it, upon his private business as well as public, and present bills to him in person, wherever he may happen to be."

It is common knowledge that this state provides offices for its executive in the state house. The laws provide for a messenger to the "chief executive office," and for servants for the executive offices at the capitol.— Code, §§ 561, 563. A private secretary and a recording secretary are also provided for.—Code, §§ 555, 556. Indeed, every convenience for the consideration and dispatch of the public business with which the executive may be concerned is afforded at and for the office of the executive in the state house. There is universal public acquaintance with the fact that quarters and the official force of the executive are in the state house. It is just as universally known and expected that the executive quarters is the place at which it is the duty and practice of the executive to attend and consider his public duties. These matters of general knowledge underlie and support the conclusion with respect to the sufficiency of *presentation* which is before quoted from *State ex rel. v. Porter,* 145 Ala. 547, 40 South. 144.

The wholesomeness and rationality of this view of the constitutional requirement for the presentation of bills to the executive invited and received the approval of the Supreme Court of Louisiana, in *State ex rel. Michel,* 52 La. Ann. 936, 27 South. 565, 48 L. R. A. 218, 78 Am. St. Rep. 364. The headnotes of the decision were prepared by Justice Blanchard, who wrote the opinion for the court. As is perfectly apparent from the opinion, it was not only proper but necessary that the constitutional provision of that state, with respect to presentation of bills to the executive, should be construed. The first headnote is as follows: "(1) A bill which has passed both houses of the General Assembly, and been signed by the presiding officers thereof, is presented to the Governor, within the meaning of the Constitution, when the clerk of the House of Representa-

tives or secretary of the Senate carries the same to the executive office, and offers or tenders it to the Governor *or his secretary.*" (Italics supplied.)

The reasoning of the court in that case aptly demonstrates that, if a *presentation* to the executive *in person* was affirmed as the constitutional mandate, the executive would be vested with the power, if he remained within the commonwealth (Const., § 128), to defeat, by absence from his office, or otherwise the presentation of bills to him, and thereby render wholly vain legislative work.

In the opinion of the Justices of Massachusetts (99 Mass. 636-638), the pertinent section of the Constitution of that state was construed as requiring that bills that have passed "must" to become law, "*be laid before the Governor personally.*" The constitutional provision there construed provided "that no bill shall become a law, and have force as such, *until it shall have been laid before the Governor for his revisal,* * * * and in order to prevent unnecessary delays, if any bill shall not be returned by the Governor, within five days after it shall have been *presented,* the same shall have the force of law." (Italics supplied.) That provision was, as appears, not the counterpart of ours; for the presentation latterly mentioned in the organic law of that state was colored *in meaning* and *effect* by the preceding requirement that bills, to become law, should be *laid before the Governor.* And the response given by the justices appears not to have taken account of a long-recognized practice, by the departments concerned, of lodging bills with the executive secretarial force in the executive office.—*State v. South Norwalk,* 77 Conn. 257, 264, 58 Atl. 759.

What the view of the justices would have been, had the practice indicated long prevailed under that provis-

ion of that Constitution, and then the reordination thereof effected in a later organic law, cannot be discovered in their opinion. In short, the question determined there had not the factors of constitutional terms and long-recognized practice and of reordination of those terms that must be considered by this court in this instance. On the concrete question propounded to them, viz., whether presentation to an "independent officer" (Secretary of State) was a compliance with the constitutional mandate there to be interpreted, there could be no real room for argument or doubt.

In *State v. South Norwalk, supra,* treating a constitutional provision very similar to our own, with respect to presentation of bills to the executive, the court said: "It cannot be deemed to have been presented to him until it has been in some way put into his custody, *or into that of some one properly representing him,* in such manner that he has reasonable opportunity to inspect and consider it." The court then alludes to the statutory provision made, soon after the Constitution was adopted, for the proper presentation to the Governor at the executive offices during sessions of the General Assembly. This legislative action was interpretative only; for, if the organic law required a personal presentation to the Governor, the lawmakers were powerless to alter the requirement, so as to allow the presentation to a *representative* of the Governor. The statutory interpretation in that instance should not be more forceful or valuable in aid of correct construction than the long practice in this state, to which allusion had been made.

In the light of these considerations, weighed with that caution with which courts of last resort wisely proceed when invoked to interpret a provision of the organic law to an effect materially different from that great de-

partments of the government have long attributed to, and executed it, the conclusion would seem to be unescapable that the quoted, pertinent, pronouncement of *State ex rel. v. Porter, supra,* expresses the meaning and effect of "presented," as that term appears in section 125 of the Constitution.

Was House Bill 323 *presented* to the executive; and, if so, when?

By the Act approved February 22, 1866 (Acts 1865-66, p. 88), provision was made for, among others, the compensation of these "officers in the executive departments of the state," viz., "private secretary of the Governor" and "recording secretary of the Governor." These positions appear to have had statutory recognition ever since, being provided for at this time by Code 1907, §§ 555, 556. These constitute the strictly secretarial force of the executive office. The selection of the person to serve in each of these places is committed to the executive, who, it is provided, may *employ* them, and may *discontinue* their services, in his discretion.—Section 557. They have no fixed tenure. They serve at the pleasure of the executive engaging them. Some of the duties of the private secretary of the executive are prescribed by statutes. Those of the recording secretary are not particularly prescribed by statute. "A secretary is an official scribe; an amanuensis or writer; a person employed to write orders, records and the like"—and the word "secretary" is, according to proper usage, synonymous with "clerk."—7 Words and Phrases, p. 6381. From the statute-prescribed source of their selection, their unfixed tenure, and the words employed to designate them, these secretaries are obviously closely related to the person of the executive in his public service. They are his personal staff. The name "recording secretary" is indicative of the character of the service

contemplated. of performance by the person employed for that position. When coupled with "secretary," it is clear that the descriptive word "recording" intends a public servant, whose duty should be to enter or keep the record of the executive office.—*Montgomery Beer Bottling Works v. Gaston,* 126 Ala. 448, 28 South. 497, 51 L. R. A. 396, 85 Am. St. Rp. 42. Performing public duties of the gravest importance, among which are those concerning the legislative function prescribed by section 125 of the Constitution, it is apparent that the executive must have and cause to be kept *records* of official acts. It is inconceivable that so important a public service as the executive constantly performs could be performed without the keeping of *record thereof.* The creation, at the public expense, of the position of *recording secretary* is alone conclusive, not only of the *necessity* for a *record* to be kept of executive official acts, but that such a *record* is, in fact, kept by that secretary. Surely it cannot be assumed that the expense of compensating a recording secretary to the executive would be charged upon the public treasury if the service his official title suggests was not to be performed by him. It may, hence, be asserted with every assurance of correctness that the creation of a recording secretaryship is as emphatic an expression of the executive necessity and duty of the keeping of a record of his official acts, etc., as would have been a legislative command that the executive cause to be kept a general record of the official proceedings, as was the statutory requirement in Ohio, alluded to in *Wrede v. Richardson,* 77 Ohio St. 182, 82 N. E. 1072, 1074, 122 Am. St. Rep. 498. And consulting the relevant *custom* prevailing in the executive office, as should be done, and as was done in *Wrede v. Richardson, supra,* it is known that, in the performance of his service in the executive office, the recording.

secretary's duty and practice, under the present executive administration, was to receive bills that had passed the houses, and that were brought to the executive office for the executive consideration, and to receipt the legislative clerk or messenger therefor, and that the recording secretary kept a book in which he entered the date of such delivery of the enrolled bill to him, and that a stamp was also provided and customarily used wherewith to stamp, upon the enrolled bill itself, the fact and date of reception of the enrolled bill in the executive office. Under these circumstances, it is evident that writings made by the recording secretary, in his official capacity, are public records; and so even under strict rules of evidence, serviceable upon the trial of ordinary issues of fact, that are not to be thoughtfully doubted.

It has been suggested that a writing, to be a record and admissible in evidence, must be kept or made under statutory authority or command. Recourse to the highest authority on the subject demonstrates that such is *not* the law. "Although a book kept by a public officer is not required to be kept by any statute, yet, if it is necessary or proper and convenient to the adequate discharge of his duties, it is an official book, and admissible as such to prove the facts therein stated. So entries or indorsements which are necessary to a proper discharge of official duty are competent, though not expressly authorized or required by law."—10 Ency. of Ev. pp. 716, 717, and notes thereon; *Sandy White v. U. S.,* 164 U. S. 100, 17 Sup. Ct. 38, 41 L. Ed. 365; 1 Greenleaf, §§ 483-485; *Evanston v. Gunn,* 99 U. S. 660, 665, 25 L. Ed. 306; Jones on Ev. §§ 508, 509.

In *Sandy White's Appeal, supra,* one question was whether book entries made by a jailer, showing the names and dates of prisoners received and discharged,

were admissible in evidence on the trial of the defendant, who was charged with presenting false, fictitious, and fraudulent claims against the United States. The court said: "We think no error was committed by the trial court in this ruling [i. e., in admitting in evidence the jailer's entries]. It was not necessary that a statute of Alabama should provide for the keeping of such a book. A jailer of a county jail is a public officer, and the book kept by him was one kept by him in his capacity as such officer, and because he was required so to do. Whether such duty was enjoined upon him by statute or by his superior officer in the performance of his official duty is not material. So long as he was discharging his public and official duty in keeping the book, it was sufficient. The nature of the office would seem to require it."

The rule is thus set down in *Evanston v. Gunn, supra:* "* * * Official registers or records kept by persons in public office, in which they are required, either by statute or by the nature of their office, to write down particular transactions occurring in the course of their public duties or under their personal observations, are admissible in evidence. To entitle them to admission, it is not necessary that a statute requires them to be kept. It is sufficient that they are kept in the discharge of a public duty.—1 Green. Evid. § 496. *Nor need they be kept by a public officer himself, if the entries are made under his direction by a person authorized by him.*" (Italics supplied.)

When it is remembered that the executive duties and prerogatives established by section 125 are of such grave importance in the making of laws that they are restricted, for seasonable, effectual exercise, to a stipulated period, that they are almost constantly invoked for application during a legislative session, that their

exercise naturally involves, in the executive view, fidelity to the public policies to which he has, before the electorate, committed and obliged his administration, that the multitude of executive duties, along with those imposed by section 125, forbid even the effort to retain in memory the executive acts, much less the inception of the limitation periods stipulated in section 125, it may be said to be unimaginable that the executive functions, particularly with respect to the duties imposed by section 125, could be performed, with any approach to orderliness, without the keeping of a record thereof. The nature of the office of chief executive, and of that of its subordinate, intimately related functionary, the recording secretary, requires the keeping of records, the entry and indorsement, of official acts, and of processes leading thereto.

The like considerations and conclusions apply to a book kept by the clerk or messenger of the respective Houses, wherein the recording secretary receipted for bills transmitted to the executive office, in observance of the requirements, in that regard, of section 125 of the Constitution. Such a book falls within the provision of Code, § 909, which reads: "At the close of each session, the secretary of the Senate, and the clerk of the House of Representatives, and Secretary of State, must select all papers belonging to the Legislature, except such as relate to unfinished business, and deposit them in the office of the Secretary of State." Such papers are, of necessity, public documents; and their required deposit with the Secretary of State refutes the notion that such documents were or are the *mere private memoranda* of those who serve the houses in clerical capacities.—Code, §§ 909, 912. This is particularly true of the receipt book, kept by legislative officers, of bills transmitted to the executive office—an act

(transmission) required of the Legislature in the performance of its functions under section 125 of the organic law.

The following *records,* kept or made by officials in their official capacities, show that the enrolled House Bill 323 was transmitted to the executive office on March 22, 1911, and delivered to the *recording secretary of the Governor;* (a) The receipt thereof and therefor, by the recording secretary, in the receipt book kept by the enrolling clerk of the House of Representatives of enrolled bills so transmitted, which receipt book is now deposited in the office of the Secretary of State. (b) The book kept by the recording secretary of the Governor, in which he entered the date of the receipt, by him, of the enrolled bill so transmitted from the Legislature to the executive office. (c) The following words, indorsed by the recording secretary on enrolled House Bill 323: "No. 162. Received March 22, 1911, Governor's office." The number "162" being the Governor's number. From the "record book" kept by the recording secretary (Mr. Nunnellee), he testified that the enrolled bill left the executive office March 31, 1911. The executive's message, before mentioned, with respect to House Bill 323, bears the like date; and the House Journal, as previously stated, shows that to have been the date of the *return* of the bill by the executive.

From these public records, made by public agents in the orderly process of promoting and invoking, according to constitutional mandate (section 125), the executive's legislative function in the enactment of laws, it appears *with absolute certainty* that House Bill 323 was *presented* to the executive on March 22, 1911.

The presentation on March 22, 1911, being established and effected, the constitutional limitation, within which the executive must have acted in order to avert

the bill's becoming a law, began to run against execu-
tive action.  Obviously the Legislature was powerless to
suspend the running of the limitation.  Aside from the
recall of the bill from the executive custody and his re-
turn of the bill in accordance with that request, the
only action of the Legislature by which the limitation
(for executive action) could be affected was by *recess-
ing.*

The sole effect of a recess, as plainly provided by sec-
tion 125, is to add two legislative days, where return
within the six-day period is prevented by *recess* of the
house originating the bill.  There is no semblance of
warrant in the organic law for the notion that the Leg-
islature may *suspend* the running of the limitation; it
having once begun.  The result necessarily is that by
the very letter, expressive of the clear spirit and pur-
pose, of the Constitution, the omission of the executive
to act on the bill within the prescribed period after
presentation makes it a *law*—constitutes the bill an
enactment.  If the Legislature might pronounce other-
wise, the legislative *will,* and not the Constitution,
would be supreme.  If the Legislature may treat a bill
presented to and retained beyond the period by the ex-
cutive as still in fieri, still subject to the mold of legis-
lation, when in record-established fact it has passed,
under clear constitutional pronouncement, that stage,
it cannot be said that the Constitution is the paramount
law of this state.  Given a presentation of a bill to the
executive, which presentation has not been withdrawn
by perfected recall of the bill, the constitutional limita-
tion begins; and, if not interrupted in one of the modes
thereby (section 125) prescribed, the bill becomes a
*law.*  To hold otherwise would subvert the organic law
in respect of its plain provisions.

The House originating Bill 323 was, as shown by its Journal, in session on March 29, 1911. March 25, 1911, was Sunday. Hence the last (sixth) day on which the executive might return House Bill 323, and thereby prevent its becoming a law as signed by the presiding officers of the houses on March 22, 1911, was March 29, 1911. Not having returned the bill till, as is shown with all certainty, March 31, 1911, the bill, as presented to him on March 22, 1911, became a law, *and so by express mandate of the organic law.*—Section 125.

The idea that the Legislature on March 31, 1911, approximately two days after House Bill 323 became a law, might or did, by necessary or reasonable implication from its unqualified action on the amendment proposed by the executive on March 31, 1911, investigate and determine conclusively that the executive return of the bill was seasonable, is, as before indicated, wholly untenable. The bill having been presented so as to require its return by the executive not later than March 29, 1911, if the Legislature had solemnly pronounced, on March 31, 1911, that the executive return was within the prescribed time, it would have been utterly vain, unless it could be affirmed that, notwithstanding constitutional limitations and mandates, the Legislature may conclusively declare that an act is a bill, *and not a law,* which in truth and fact had, *pursuant to constitutional provision,* become a *law.* The Constitution is the supreme law to all departments of our government. And it is finally accepted here "that, under our Constitution, a bill becomes a law only after it has passed through all the forms prescribed, and made necessary to give validity to legislative enactments."— *Stein v. Leeper,* 78 Ala. 517, 521; *Jones v. Hutchinson,* 43 Ala. 721; *Moog v. Randolph,* 77 Ala. 597. Under our Constitution, that which has become a *law* cannot be

changed or amended by legislative action taken otherwise than in the manner and according to the constitutional prescriptions for the enactment of laws, which is by bill formulated, in title and substance, as the organic law prescribes, and conformable to the rules of committee consideration and passage which that instrument particularly requires.

It has been suggested that to accept the specified *record* evidence of presentation of this bill on March 22, 1911, institutes a conflict with or contradiction by the journals of the houses. In the journals of the houses, there is no reference whatever to the matter of seasonable return of this bill by the executive. It is by attributing to more action, by the Legislature, upon the amendment proposed by the executive that the journals are said to express anything anent the seasonableness of the executive return of the bill. The journal is an official narrative of the proceedings of the respective houses.—*State ex rel. v. Greene,* 154 Ala. 249, 46 South. 268.

It is common knowledge that the executive of this state does not sit with the Legislature, and that his offices are removed from the legislative chambers. It appears, also, that the Constitution makers were particularly cognizant of these facts, since they provided for the transmission of bills that had passed the houses to the executive by such verbiage as necessarily imports the idea of his removal from the presence of the houses. The presentation of bills to the executive being, therefore, an act transpiring *outside the presence* of the houses, the *fact* thereof could have no place on the journals of the houses; and in consequence even an assertion (not here present) of the *fact* of presentation, with its date, upon the journals of the houses would be matter foreign to the journals; for the houses, unless pre-

sentation was made in one or both of them, cannot record a *fact* occurring elsewhere. What verity or effect would or should be given the journal record of a *report,* in regular course of legislative work, by a messenger or officer of one or both of the houses, reciting that he had presented a certain bill to the executive in accordance with section 125, when that report is in conflict with executive records, would raise questions not pertinent here; for no such report appears to have been made or spread upon the journals of either house. In fact, the receipt book kept by the enrolling clerk of the House of Representatives conforms, in respect of the date of pre-. sentation of House Bill 323, to the records kept in the executive office, and to the fact of presentation indorsed on the enrolled House Bill 323.

It has been also suggested, as upon the authority of *Robertson v. State,* 130 Ala. 164, 30 South. 494, *Ex parte Howard-Harrison Iron Company,* 119 Ala. 484, 24 South. 516, 72 Am. St. Rep. 928, and *Montgomery B. B. Works v. Gaston,* 126 Ala. 425, 28 South. 497, 51 L. R. A. 396, 85 Am. St. Rep. 42, that the act as promulgated, coming as it does from the custody of the proper custodian of enactments of this state, its journal history fair, and bearing the approving signature of the executive, must be finally accepted by the courts as duly enacted in all particulars; fraud or forgery not being shown in respect to it. None of these decisions should or do control the conclusion on the question here involved. In *Ex parte Howard-Harrison Iron Company,* the question was whether the bill approved by the executive was the bill, not materially variant from the bill, passed by the houses. It was ruled that the presumption favored their identity; and that that presumption could only be overcome by the journals kept by the houses. Obviously that ruling was sound; for the

highest and only evidence of what bill the houses passed were the journals thereof.

In *Montgomery B. B. Works v. Gaston,* the contest invoked the decision of the question whether the houses passed or adopted the *same bill.* It was necessary, in determining this question, to ascertain what was the journal; whether it was the loose *memoranda* kept by the clerks, or. the. compiled and bound volume. It was held that the bound volume was the journal; and, consulting it as the conclusive evidence of legislative action by the houses, the view prevailed that therefrom it appeared that the lower house had not adopted the Senate amendments, and thereby, as of course, leading to the constitutional invalidity of the enactment.

In *Robertson v. State,* these objections, as leading to constitutional invalidity, were asserted: (1) That the act was "wholly changed in its title and purpose during its passage through the" lower house; (2) that it was not read on three different days in either of the houses; (3) that it was not signed by the Speaker, its signature being by the Speaker pro tempore, Mr. Tunstall; the Speaker, Mr. Pettus, being ill at the time. The. court held the act valid, and so in respect to the objections other than the last (third), upon the authority of the mentioned two decisions in 119 Ala. 484, 24 South. 516, 72 Am. St. Rep. 928, and 126 Ala. 425, 28 South. 497, 51 L. R. A. 396, 85 Am. St. Rep. 42.

In these cases, presenting the questions stated, it can-not be that this court ruled or intended to rule that matters necessarily and invariably, according to common and judicial knowledge, occurring in the executive office, removed from the legislative chambers, could or should properly appear upon the journals. By no sort of assumption could that be affirmed of these decisions. They did not, even remotely, invite the construction of

section 125 in the particular with which this appeal is concerned. Whether the acts there considered became *law*, under the limitations and prescriptions of section 125 for executive action, was not involved or taken into account in any way. These cases, however broad their language, are without bearing here. This doctrine is, however, too deeply imbedded in our law to be now doubted, much less disturbed: That *no bill* can become *a law* until it has been enacted according to the forms prescribed by the Constitution. Whether, in a given case, those forms have been observed is essentially a judicial question.—Author, supra.

When the constitutional prescriptions are such as the houses are required to observe, and their observance is shown by the *record* (the journals) thereof, the courts accept finally the assertions of that record. This according to the wholesome notion of verity with which the courts are accustomed to view the memorials of tribunals jurisdictioned to make them.

The right of the Legislature to *act upon* an amendment proposed by the executive is particularly prescribed in section 125. *The condition* to that right is the executive *return* of the bill, with his proposed amendment, within the period prescribed. The consequence of delay in this particular beyond the period is that the bill adopted by the houses, and signed by the presiding officers thereof, becomes a *law*.

The right of the executive to return a bill, with proposed amendment, depends upon his action within a prescribed period. The right of the executive to veto a bill, thereby preventing its becoming a law, unless subsequently reconsidered and passed by the houses as the organic law requires, likewise depends upon his action within the prescribed period. Each right is limited, restricted, to a definite period. Beyond that period, nei-

ther the executive nor the Legislature has any power or authority to defer, to defeat, or to alter the legislative will as expressed in the bill presented to him, except by a new enactment. These are constitutional restraints —mandates—just as supreme and binding as any others, to be found in that instrument.

Does mere presumption (to say nothing, at this time, of the refutatory executive records to which particular reference has been made) of conformation to constitutional requirements in the enactment of laws conclude judicial inquiry, when pointedly invoked, whether the act promulgated became a *law* in consequence of observance of constitutional commands?

When, as here, the executive action or nonaction, within a constitutionally prescribed period, is the determining factor, it is obviously no answer to say that this court has given a concluding effect to the journals of the houses in respect to matters properly appearing upon them, or that it has indulged, to finality, the presumption that, though the journals are silent, the rightful processes of legislation *in the houses* were observed.

In *Sadler v. Langham*, 34 Ala. 311, 322, it was ruled that the character of the presumption, of conformation to constitutional requirements by the Legislature, in the enactment of laws, was *not conclusive*—not conclusive upon the judicial department, to which, in the division of governmental powers (the express restriction of each department to its sphere) such inquiries are committed by the organic law.—Const. §§ 42, 43.

If the stated, conclusive presumption should be accepted, it may be inquired whether those provisions of the organic law (section 125), whereby executive action is required within prescribed periods, as affecting the enactment of laws, are not bereft of any means or tribunal for their enforcement, or of any force in the con-

stitutional methods for the enactment of laws; whether the stated presumption has not stricken from the organic law these limitations and prescriptions, even the pronouncement that a bill, not seasonably *returned,* "shall become a law in like manner as if he had signed it?"

If a promulgated bill, apparently valid, is assailed for fraud or forgery in respect of executive action thereupon, would the presumption stated shield it from judicial inquiry in the premises? If it would *not,* it may be inquired whether the nonobservance of clear constitutional mandates is not as fatal to *valid* legislation as the grave wrongs of the class to which fraud and forgery belong? If a litigant may, in promotion or defense of a right, say, "the executive did not sign, approve, that bill, though his name appears thereto," ought another litigant, in promotion or defense of his right, be permitted to assert and show, by public records kept, in regular course, in the executive office, that the executive delayed his return or veto of the bill until the *Constitution* pronounced it a law "in like manner as if he had signed it?"

In this instance, relator contends that the *presented* (on March 22, 1911) bill became and is the law; while, on the other hand, the respondents assert that the bill, with the amendment proposed by the executive, became and is the law. The former's insistence is justified by the *public records* of the executive office and that kept by the enrolling clerk of the House of Representatives; the bill, signed by the presiding officers of the houses on March 22, 1911, not having been *returned* by the executive within the period prescribed by the Constitution, became a law under the express mandate of the Constitution. Such being the case, the amendment proposed by the executive on March 31, 1911, and adopted by the

houses, never had the force of law; the orderly processes for the amendment or change of that which was already a *law* not having been conformed to in the adoption of the amendment so proposed by the executive.

The opinion is therefore entertained that the respondents were not and are not lawfully constituted commissioners of the city of Montgomery; that their appointments were and are without the sanction or authority of law, and hence were void.